STATE OF CONNECTICUT *v.* SHERMAN BROWN
(AC 21667)

Mihalakos, Dranginis and Flynn, Js.

Argued May 2—officially released July 16, 2002

*Michael O. Sheehan*, special public defender, with whom was *George Kouros*, law student intern, for the appellant (defendant).

*Thomas M. DeLillo*, special deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Elpedio N. Vitale*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, Sherman Brown, appeals from the judgment of conviction of assault in the first degree in violation of General Statutes §§ 53a-8 and 53a-59 (a) (5), conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 and 53a-59 (a) (5), and criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c.[1] On appeal, the defendant claims that prosecutorial miscon-

---

[1] The defendant elected a trial by jury on counts one and two, and a trial to the court, held contemporaneously with the jury trial, on count three.

duct during closing argument deprived him of his right to a fair trial and, therefore, his conviction should be reversed. Although we agree with the defendant that some of the prosecutor's conduct was improper, we conclude that none of the misconduct caused substantial prejudice to the defendant such that he was deprived of his right to a fair trial. We, therefore, affirm the judgment of the trial court.

The following facts are relevant to our resolution of this appeal. The defendant and the gang with which he was associated were selling drugs from a "white house" located on Saltonstall Street in New Haven. Another individual, Clifford Portee, and the gang with which he associated, frequently sold drugs in front of the residence located at 108-110 Poplar Street, which was located just around the corner from Saltonstall Street. On or about June 4, 1996, shots were fired at the "white house" on Saltonstall Street. The defendant and his gang assumed that Portee and his gang from Poplar Street were responsible for that shooting.

On June 5, 1996, at about 5 p.m., an argument broke out between the defendant and the Saltonstall Street gang, and Portee and the Poplar Street gang concerning the shooting that had occurred the previous day. During the course of that argument, some member of the defendant's gang threatened Portee and his Poplar Street gang that someone was going to pay for shooting at the "white house." At about 9 p.m. that same evening, Miranda Reed was walking along Poplar Street toward her home on Saltonstall Street. She saw Portee, who was sitting on the porch of the 108-110 Poplar Street residence, and briefly spoke with him. As Reed turned left at the corner of Poplar Street and proceeded onto Saltonstall, she saw the defendant and another individual, who Reed could not identify, exit the "white house." The defendant was carrying a pistol in his right hand

as he and the other individual ran around the corner and headed onto Poplar Street.

At about that same time, Santa Figueroa and her eighteen month old son were visiting Figueroa's friend, Estacy Reguelmy, who lived at 108-110 Poplar Street. The three were in the living room watching a movie. The living room was located in the front of the house. Two of the living room windows faced Poplar Street. Figueroa was holding her son in her arms while sitting on the couch, which was located to the left of the windows. At about 9:15 p.m., several shots rang out. One bullet struck a car that was parked about thirty feet south of 108-110 Poplar Street. The remainder of the bullets struck various parts of the house at 108-110 Poplar Street. Two bullets struck the front door and one stuck an interior hallway door. One bullet penetrated the front of the house below the living room windows, and struck Figueroa's eighteen month old son in the leg. The bullet exited the boy's leg and hit the television, shattering its screen. Shortly thereafter, Reguelmy opened the door to her apartment so she could run next door to get Figueroa's mother and found Portee in the hallway. Reguelmy, earlier in the evening, had asked Portee to move away from her front porch. Portee appeared nervous but was unharmed. He entered Reguelmy's home and attempted to calm Figueroa, who was hysterical.

Meanwhile, Reed, who had heard gunshots coming from the direction of Poplar Street, began to run from her home on Saltonstall Street toward Poplar. As she headed in that direction, she saw the defendant and another individual running away from Poplar Street where the gunshots had come from, and toward the "white house" on Saltonstall Street. On June 6, 1996, Reed gave two tape-recorded statements to the police in which she implicated the defendant as the individual she had seen running with the gun. Also, in June, 1996,

the defendant was in possession of a gun, which he attempted to hide at his girlfriend's apartment.

Sometime after the shooting, the defendant approached Figueroa, the mother of the child who was shot, and told her that if he had known that there was a child in the house on the night of June 5, 1996, "it wouldn't have went on." The defendant also told Figueroa that if her son needed anything he would "be there." He also offered to buy Figueroa a new television.

On June 10, 1996, the defendant was arrested and charged with assault in the first degree in violation of §§ 53a-8 and 53a-59 (a) (5), conspiracy to commit assault in the first degree in violation of §§ 53a-48 and 53a-59 (a) (5), and criminal possession of a pistol or revolver in violation of § 53a-217c. He was convicted of all three counts. He was sentenced to a total effective sentence of twenty years, execution suspended after twelve years, with five years probation on all charges. This appeal followed. Additional facts will be set forth as necessary.

At the outset, we note that the defendant's claim of prosecutorial misconduct was not preserved at trial. The defendant now seeks review of this claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or in the alternative, under Practice Book § 60-5, which provides for plain error review. The defendant also asserts that his prosecutorial misconduct claim should be reviewed pursuant to this court's supervisory authority over the administration of justice.

Where the defendant has failed to object to the alleged prosecutorial misconduct at trial, on appeal he may prevail on his claim under *Golding* only if he satisfies all four prongs of the test set forth in that case.[2]

---

[2] We do not repeat the entire four prong test first set out in *Golding* because it has been repeated several hundred times in later cases that have followed *Golding*.

We conclude that in the present case, the defendant's claim fails under the third prong of *Golding* because he has failed to demonstrate that a constitutional violation clearly existed and that he was clearly deprived of his right to a fair trial.

Our standard of review of a claim of prosecutorial misconduct is well settled. "Our Supreme Court has previously acknowledged that prosecutorial misconduct can occur in the course of closing argument. . . . It is well settled, however, that a defendant may not prevail under *Golding* . . . unless the prosecutorial impropriety was so pervasive or egregious as to constitute an infringement of the defendant's right to a fair trial . . . ." (Internal quotation marks omitted.) *State* v. *Jones*, 65 Conn. App. 649, 656, 783 A.2d 511 (2001). "To prove prosecutorial misconduct, the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 699–700, 793 A.2d 226 (2002).

In the present case, the defendant's argument is based on three separate categories of proscribed conduct. He claims that during closing argument, the prosecutor (1) improperly attacked the integrity and institutional role of defense counsel, (2) improperly and frequently stated his personal beliefs regarding the case, and (3) improperly claimed that defense counsel believed that the defendant was guilty. The defendant maintains that the cumulative impact of these improper comments violated his right to a fair trial. He further maintains that our Supreme Court's recent decisions in *State* v. *Singh*, supra, 259 Conn. 693, and this court's recent decisions in *State* v. *Moore*, 69 Conn. App. 117, 795 A.2d 563, cert.

denied, 260 Conn. 941, 835 A.2d 59 (2002), and *State* v. *Thompson*, 69 Conn. App. 299, 797 A.2d 539 (2002), mandate reversal of his conviction. We disagree. We address the defendant's claims of misconduct seriatim.

The defendant first claims that during closing argument, the prosecutor improperly attacked the integrity and institutional role of defense counsel. He contends that certain of the prosecutor's comments implied that all defense counsel, and his defense counsel in particular, are unethical and deceptive. He further contends that the prosecutor's remarks that defense counsel was using a "smoke screen" and "trying to fool the jury" were designed to undercut the defense by portraying defense counsel's presentation of the case as a series of tricks, and that the remarks were designed to appeal to the emotions and prejudices of the jury.

The following additional facts are relevant to our disposition of this issue. During closing argument, defense counsel argued that although the evidence tended to show that the defendant was associated with a group that was selling drugs on Saltonstall Street, the jury should not convict the defendant of the assault and conspiracy charges on the basis of the fact that he was associated with a gang or that he may have been selling drugs. In rebuttal, the prosecutor made the following remarks to the jury: "[D]on't be *fooled* by this, ladies and gentlemen. *That is why defense will stand up here like [defense counsel] just did and admit to you certain obvious and uncontested things like was done in this case.* . . . [T]he impression that [defense counsel] would like to create with you is that, well, it is kind of empathetic, the defense admits this stuff and [defense counsel] said [the prosecutor] is a good guy, this stuff really must—the rest of the stuff must be questionable because why would he be admitting all the other stuff. So, therefore, *fall into that trap* and [say] that the rest of the stuff is not really proven because he

is admitting to stuff that really must have been proven. *Don't fall for that. That is a smoke screen employed by defense attorneys at any trial. [Defense counsel] has been doing this a long time.*" (Emphasis added.)

The prosecutor also asked the jury not to "be fooled" by either the defense theory that there may have been more than a single shooter or its theory that because there were shots fired into a nearby car and sprayed across the front of the house that the defendant did not have the requisite intent to commit assault in the first degree, but perhaps only some lesser included offense, namely, assault in the third degree. Finally, the prosecutor argued that defense counsel had used phrases such as "this is not a mystery" and this case is "mish-mashing" because "[*defense counsel] has been doing this for a very long time and, as any defense attorney would do, he is trying to convince you, basically, ladies and gentlemen, that this is too hard for you to figure out.*" (Emphasis added.)

"While a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Furthermore, [t]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel." (Citation omitted; internal quotation marks omitted.) *State* v. *Chasse*, 51 Conn. App. 345, 357–58, 721 A.2d 1212 (1998), cert. denied, 247 Conn. 960, 723 A.2d 816 (1999). "[W]e must review the comments complained of in the context of the entire trial." (Internal quotation marks omitted.) Id., 358.

"In determining whether prosecutorial misconduct amounts to a denial of due process, we consider whether the conduct was improper, and, if so, we next determine whether the conduct caused substantial prejudice to the defendant. . . . We do not focus alone,

however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 69 Conn. App. 304.

We now turn to the first step in our analysis of whether the defendant was deprived of his right to a fair trial by first determining whether the challenged statements made by the prosecutor were improper. If they were not improper, there is no need to address the second step of analysis concerning whether substantial prejudice resulted to the defendant.

We first consider remarks that were clearly improper and should not have been made or permitted to be made in a Connecticut courtroom. It was permissible for the prosecution to point out that simply because the defense counsel had admitted that his client had been associated with a street gang of drug peddlers, the jury should not infer that the defendant was not guilty of the assault with which he was charged. It was not, however, proper for the prosecutor to assert that this was a "smoke screen" that defense counsel and all defense attorneys employ as some kind of usual tactic designed to delude juries. First, there was no evidence of this. Second, even if such evidence had been offered, it was not material because it did not tend to prove the guilt or innocence of the accused.

Having concluded that the prosecutor's conduct was improper, we next turn to the second step of our analysis, namely, whether the misconduct caused the defendant substantial prejudice. In *State* v. *Singh*, supra, 259 Conn. 700–701, our Supreme Court focused on several factors to be considered in determining whether prosecutorial misconduct was so severe that it caused substantial prejudice to the defendant, thereby amounting

to a denial of due process. Those factors include (1) the extent to which the misconduct was invited by defense conduct or argument, (2) the severity of the misconduct, (3) the frequency of the misconduct, (4) the centrality of the misconduct to the critical issues in the case, (5) the strength of the curative measures adopted and (6) the strength of the state's case. Id.

We now apply those *Singh* factors to the misconduct here. We address the last *Singh* factor first because our observations concerning the strength of the state's case, which is a strong factor militating against reversal, apply to all three categories of the claimed misconduct.

Factually, the state had a very strong case. Although there were no eyewitnesses to the shooting itself, there was other strong evidence of guilt, including eyewitness testimony that established that Portee was sitting at 108-110 Poplar Street shortly before the shooting, and that the defendant was headed in that direction with a gun in his hand just seconds before the shooting occurred and headed away from that direction just seconds after the shots were fired. Furthermore, the jury had before it evidence of the fact that the defendant had a motive to shoot Portee, a rival drug dealer with whom the defendant's gang was feuding. It also had before it the defendant's own statements to Figueroa, i.e., that if he knew that there was a child in the house, "it," meaning the shooting, would not have occurred, and evidence of the fact that the defendant had attempted to hide a gun at his girlfriend's apartment near the time of the shooting, both of which the jury could have reasonably interpreted as consistent with the guilt of the defendant.

We now turn to the other *Singh* factors as they apply to the first category of misconduct. The prosecutor's comments relating to the tactics of defense counsel were, to a great extent, invited by the defense. On

numerous occasions during his closing, defense counsel improperly mentioned tactics that all prosecutors, and the prosecutor in this case in particular, allegedly employ in all criminal cases.[3] Therefore, after viewing the prosecutor's remarks in the context in which they were made, as they must be, we conclude that those comments did not deny the defendant his right to a fair trial. See *State* v. *Copas*, 252 Conn. 318, 340, 746 A.2d 761 (2000). The prosecutor's comments were severe. He insinuated that all defense counsel are charlatans. The comments did not, however, occur in a vacuum, but in response to equally irrelevant and improper defense arguments. See footnote 3. The comments were infrequent; they occurred only during the rebuttal portion of the prosecutor's closing argument. The comments were not central to the issues in the case, which were whether the defendant had conspired with another individual and whether he fired the shots that struck the eighteen month old victim. We also note that the defendant did not object to the challenged remarks at trial or request that a curative instruction aimed at those remarks be given by the court. Furthermore, although it was not requested to do so, the court, in its charge, specifically instructed the jury: "You must not be influenced by any personal likes or opinions or prejudices or sympathy. Opinions of either counsel as stated to

---

[3] For example, during closing, defense counsel, in an attempt to explain why certain witnesses testified in a manner that was contradictory to their pretrial statements, argued: "One of the things that [the prosecutor], and it is commonly done and it is commonly true, tries to explain somebody's . . . . But one of the things that is often said is this, well, somebody comes in and they tell a different story than they did to the police at the time . . . ." Later, he argued: "Whenever any witness changes their story, it seems to be that the implication is made and it is being made here that somebody threatened them or told them, don't show up, or I will buy you something if you don't say what you were supposed to say." On another occasion during closing argument, defense counsel argued: "Now, every time I mention a lesser included offense, the prosecutor says, [defense counsel] would like you to believe, number one, he didn't do it."

you in their arguments are in no way binding upon you in your determination of the facts, although you should weigh and consider the arguments of counsel as to the facts. It is your recollection of the evidence that controls. Not mine, not that of the attorneys." We have no reason to believe that the jury disregarded those instructions.

After applying the *Singh* factors to the defendant's first claim of prosecutorial misconduct, we cannot say that the prosecutorial misconduct at issue in this claim caused the defendant to suffer substantial prejudice such that he was deprived of his right to a fair trial.

We next turn to the defendant's second claim of prosecutorial misconduct. He contends that during closing argument the state's attorney improperly and frequently stated his personal opinion about the guilt of the defendant and the credibility of the witnesses. He further contends that certain of the prosecutor's statements were made to appeal to the passions and prejudices of the jury. Again, we first determine whether the challenged conduct was improper and, if so, we then determine whether the misconduct caused the defendant substantial prejudice.

The following additional facts are necessary to our resolution of this claim. At the outset, we note that the defendant points us to no place in the record where the prosecutor improperly expressed his personal opinion about the credibility of witnesses. The prosecutor did point out, as he was entitled to do, the strength of his own case and the weakness of his opponent's case, based on inconsistencies in the testimony of the witnesses. Additionally, the prosecutor did, in several instances during closing argument, state his personal view as to what he believed the evidence showed.[4] For

---

[4] During rebuttal, regarding Reed's contradictory statements, the prosecutor argued: "*I think* that is pretty important. *I think* that is one of the reasons why you can choose to credit for all the other reasons in addition I have told you about, what she told the police in June of 1996." (Emphasis added.)

example, during his initial closing argument the prosecutor stated: "*I think* the evidence shows that Mr. Portee had just been the target of a shooting orchestrated and carried out by the defendant . . . ." The most egregious of those comments occurred during rebuttal when the prosecutor stated: "*I disagree . . .* vehemently with [the defense's argument that if the defendant was guilty at all, he was guilty of assault in the third degree] because *I think* it is assault, first degree . . . ." (Emphasis added.) Additionally, although Reed had given the police two tape-recorded statements prior to trial in which she implicated the defendant as a gun carrier running toward the location of the shooting seconds before it occurred, Reed gave contradictory testimony at trial. Reed's prior statements were, thereafter, admitted into evidence pursuant to *State* v. *Whelan,* 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).[5]

During closing argument, defense counsel argued that whenever a witness gives a statement to the police and then changes his or her statement at trial, the prosecution will inevitably imply that the change is due to the fact that the witness was threatened or coerced to contradict the prior statement when he or she testifies at trial. In response, the prosecutor argued that witnesses sometimes change their testimony because of fear and intimidation or because of some misguided code of silence. He argued further: "I am not saying I particularly relish having to have her come in here and put her under subpoena and do that, okay, but that is what we are here for. *You can't just let someone escape justice, ladies and gentlemen, because there may be some reluctant witnesses from time to time.*" (Emphasis added.)

---

[5] The *Whelan* rule allows the "substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." *State* v. *Whelan,* supra, 200 Conn. 753.

"It is well settled that, in addressing the jury, [c]ounsel must be allowed a generous latitude in argument . . . . The parameters of the term zealous advocacy are also well settled. The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 712–13. Furthermore, "the state must avoid arguments which are calculated to influence the passions or prejudices of the jury, or which would have the effect of diverting the jury's attention from their duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Chasse*, supra, 51 Conn. App. 357–58.

The rule is clear that it is improper for the prosecutor to state his personal opinions about the case to the jury. *State* v. *Dillard*, 66 Conn. App. 238, 252–53, 784 A.2d 387, cert. denied, 258 Conn. 943, 786 A.2d 431 (2001); see also Rules of Professional Conduct 3.4 ("[a] lawyer shall not . . . (5) state a personal opinion as to the justness of a cause, the credibility of a witness . . . or the guilt or innocence of an accused"). It is also improper for the prosecutor to align himself or herself with the side of justice, thereby implying that the defense is advocating for what is unjust. These types of statements create the risk that the jury's attention will be diverted away from its own opinion about the strength of the evidence and toward the prosecutor's

view, and invite the jury to decide the case on the basis of passion and prejudice, rather than on the evidence. See *State* v. *Dillard*, supra, 252–53; see also Rules of Professional Conduct 3.8, commentary ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence.").

Because we have concluded that the prosecutor's conduct was improper, we must now turn to the second step of our analysis, namely, whether the misconduct deprived the defendant of a fair trial. In doing so, we again conclude that when viewed in light of the *Singh* factors, the misconduct was not so egregious as to substantially prejudice the defendant, thereby infringing on his right to a fair trial. First, defense counsel invited some of the comments when he advised the jury of the inevitability that the prosecution would argue that a witness changed his or her testimony at trial because of fear. Second, for the most part, the misconduct was not severe. Although use of the prefatory phrase, "I think," may have been improper because use of the pronoun "I" increases the chance that argument will deteriorate into expressions of personal opinion; *Jenkins* v. *Commissioner of Correction*, 52 Conn. App. 385, 401, 726 A.2d 657, cert. denied, 249 Conn. 920, 733 A.2d 233 (1999); use of the word "I" is part of our everyday parlance and although it should be avoided, nonetheless, because of established speech patterns, it cannot always easily be eliminated completely from extemporaneous elocution. We do, however, conclude that the prosecutor's remark about not allowing the defendant "to escape justice" because of a reluctant witness was severe. It long has been recognized that the special role of prosecutor "must never be used as a license to state, or to comment upon, or to suggest

an inference from, facts not in evidence, or to present matters which the jury have no right to consider." (Internal quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 302, 755 A.2d 868 (2000). However, our evaluation of the third *Singh* factor, the frequency of the misconduct, limits its effect. The prosecutor's remarks were infrequent and were limited to closing argument. Fourth, although some of the remarks were central to the ultimate issue of guilt or innocence of the defendant, we observe in evaluating the fifth *Singh* prong, that the defense did not object to any of the misconduct or seek a curative jury instruction at trial. Accordingly, we conclude that this category of misconduct was not so egregious that it violated the defendant's right to a fair trial.

We now turn to the defendant's third and final claim of prosecutorial misconduct. He contends that during closing argument the prosecutor improperly stated that defense counsel believed that the defendant was guilty. This claim is without merit.

During closing argument, defense counsel explained that bullets were sprayed over the entire house where the victim was shot, with some bullets landing in a nearby car and in areas of the house far removed from the porch where the alleged intended victim, Portee, was sitting. Defense counsel stated: "Honestly, if there was a guy . . . that was that close to somebody sitting on the porch . . . I would submit to you [he] would be dead if that is what they wanted to do, or at least struck by a bullet." And later, he stated: "This case, I think, other than all the facts . . . there is a motive and the drug dealers and people are going around which is probably true, and the defendant may have been part of that." Finally, near the end of his argument, defense counsel stated: "In this case, you also will be considering a lesser included offense of assault . . . assault in the third degree. . . . *Now, every time I mention a*

*lesser included offense, the prosecutor says [defense counsel] would like you to believe, number one, he didn't do it. But just in case you think he did, convict him of the lesser crime. That is not my point."* (Emphasis added.)

In rebuttal, the prosecutor argued as follows: "Now, I want to go back to what [defense counsel] had talked about here . . . . Bad shot. The defendant was a bad shot. Don't be fooled by that. The reason . . . that was said is this . . . *the defendant apparently knowing that the evidence shows reasonably the guilt of [the defendant] mentions stuff about a bad shot because his idea of a lesser offense, which he talked about, he wants to have come into play."* (Emphasis added.)

Contrary to the defendant's assertions, we conclude that this comment cannot be fairly characterized as one in which the prosecutor argued that defense counsel believed the defendant was guilty. We conclude, instead, that the prosecutor was entitled to rebut the defendant's theory of the case with the state's theory of the case. The jury could reasonably have concluded that the prosecutor was simply attempting to counter defense counsel's argument that the jury should consider convicting the defendant of the lesser included defense simply because the bullets he fired missed his intended victim.

Even if we were to assume that this comment was improper, we would nonetheless conclude that it did not substantially prejudice the defendant. The comment was invited by defense counsel's own improper remarks about what prosecutors inevitably do when a lesser included offense is mentioned. It was neither severe nor frequent; it was said but one time. Additionally, although the remark related to a central issue in the case, namely, whether the defendant had the requisite intent to commit assault in the first degree, the defense

did not object to the argument or seek a curative instruction.

Finally, we address whether the cumulative impact of the improper conduct during argument mandates reversal of the defendant's conviction. We conclude that it does not. The challenged remarks of the prosecutor, to the extent that they were inappropriate, were at times invited by counsel, and although some were severe, they were infrequent, confined to argument and did not evidence a pattern of misconduct sufficient to deprive the defendant of his right to a fair trial. We also conclude that the challenged remarks, for the most part, did not relate to the central issues in the case and that the defendant did not seek a curative instruction. The court's general instruction that the jury must decide the case on the basis of its recollection of the evidence before it and that the arguments of counsel were not binding on the jury's determination of the facts was sufficient to cure the harm caused by the remarks at issue. Finally, for all the reasons we have cited previously, the state had a strong case against the defendant. Accordingly, we conclude that the cumulative effect of the misconduct at issue was not so egregious as to constitute an infringement of the defendant's right to a fair trial.

Nor does the misconduct in the present case mandate reversal under *State* v. *Singh,* supra, 259 Conn. 693, *State* v. *Moore,* supra, 69 Conn. App. 117, or *State* v. *Thompson,* supra, 69 Conn. App. 299. The extent of the impropriety here does not rise to level of the misconduct that occurred in *Singh* and *Thompson.* See *State* v. *Singh,* supra, 723–25 (cumulative effect of four instances of improper conduct deprived defendant of fair trial in that state's case was not strong and all improprieties directly related to critical and only disputed issue in case); *State* v. *Thompson,* supra, 303–14 (where evidence of guilt not overwhelming, religiously

charged comments during closing argument, which were repetitive and central to issue of credibility, inter alia, stating some witnesses " 'have reserved a place in hell for themselves' " constituted egregious misconduct that so infected trial with unfairness as to result in denial of due process). Furthermore, we fail to see how *State* v. *Moore*, supra, 117, supports the defendant's argument because *Moore* held that the defendant in that case had failed to sustain his burden of proving that the prosecutor's misconduct was substantially prejudicial in the context of the entire trial so as to deny the defendant his rights to due process and to a fair trial. Id., 125–28.

For all of these reasons, we conclude that the defendant's claim of prosecutorial misconduct fails under the third prong of *Golding* because he has failed to demonstrate that a constitutional violation clearly existed and clearly deprived him of his right to a fair trial.

Additionally, we conclude that these claims do not warrant plain error review. "It is well settled . . . that a defendant may not prevail under . . . the plain error doctrine unless the prosecutorial impropriety was so pervasive or egregious as to constitute an infringement of the defendant's right to a fair trial." *State* v. *Satchwell*, 244 Conn. 547, 564, 710 A.2d 1348 (1998). In the present case, the defendant has failed to prove that, in the context of the trial as a whole, the prosecutor engaged in a pattern of egregious misconduct that was so pervasive that it violated the defendant's right to a fair trial. Likewise, exercise of the court's supervisory authority is not warranted here.

The judgment is affirmed.

In this opinion the other judges concurred.