STATE OF CONNECTICUT *v.* ARTHUR LUSTER, JR.
(SC 17268)

Sullivan, C. J., and Borden, Palmer, Vertefeuille and Zarella, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of argument.

Argued March 14—officially released August 15, 2006

*George G. Kouros*, special public defender, with whom were *Cyd O. Oppenheimer* and, on the brief, *Richard A. Reeve* and *Michael O. Sheehan*, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Roger Dobris*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. The defendant, Arthur Luster, Jr., appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a. The defendant claims that the trial court, *Thompson, J.,* improperly instructed the jury on flight as evidence of consciousness of guilt, and that the state engaged in prosecutorial misconduct during closing arguments, thereby depriving the defendant of his due process right to a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The victim, Kyell Sesler, became involved in a romantic relationship with the defendant's sister, Tenea Brown. As a result of their relationship, the victim got to know various members of Brown's family, including the defendant, who became his friend. Brown and the victim had a child together, but, by 2002, the couple's relationship had become rocky and Brown's family had

become embroiled in their domestic disputes. On Friday, May 17, 2002, the victim arrived at Brown's house while the defendant was visiting her, and a heated verbal confrontation ensued between the victim and the defendant. The next day, a physical fight broke out between Troy Brown, the defendant's brother, and Breon Padgett, the victim's brother, at a shopping mall in downtown New Haven. That evening, the victim and his uncle, Rashad Bolden, drove to Tenea Brown's house looking for the defendant. After they had left, Tenea Brown related this incident to the defendant's other sister, Lanisha Brown, who called the defendant and warned him to stay out of the victim's way.

On Sunday, May 19, 2002, the defendant attended the fortieth annual Freddy Fixer parade in New Haven. The parade is an annual event that celebrates the city's African-American communities and culture. It begins at the Hamden town line and travels south on Dixwell Avenue to the New Haven green in front of city hall. The defendant drove to the parade with his brothers, Troy Brown and Antonine Brown, whom he dropped off before parking his car several streets away from the parade route. Before proceeding to the parade, the defendant removed a gun that was hidden in the trunk of his car and tucked it into his waistband.

The defendant met up with his brothers and a friend, Andrew Fain, and they walked south along Dixwell Avenue. The area was crowded with thousands of spectators. As they approached the intersection of Dixwell Avenue and Webster Street, the defendant and his companions encountered the victim, who was standing on the sidewalk with some friends and relatives. The victim suddenly and unexpectedly punched the defendant in the face, and a fistfight erupted between the defendant, the victim, and their companions.

The witnesses provided conflicting accounts of this fight. The defendant and his brothers testified that the

victim and his friends were kicking and stomping on the defendant while he lay on the ground, trying to protect his head. Friends and relatives of the victim testified that he was on the ground being stomped and kicked. A single witness, Howard Reed, had no personal connection to either the defendant or the victim. He testified that the victim was being beaten for most of the fight, and that the victim got up and tried to run just before the defendant shot him. He acknowledged, however, that because these events had occurred well over one year prior to trial, he did not clearly remember the details of what had happened.

The fight lasted for a short period of time before the defendant pulled out his gun and fired two shots in quick succession at the victim. Ira Kanfer, the state's medical examiner, testified that the shots were fired at close range, and that one bullet entered the victim's side while the other entered his upper back. Although paramedics arrived on the scene shortly after the shooting, the victim died at the hospital that afternoon. The gunfire created pandemonium, and the crowd of spectators panicked and scattered. The defendant ran from the scene. He lost the gun as he traversed a nearby park on his way home.

The police arrived on the scene shortly after the shooting. The first officer to arrive concluded that the victim had been mortally wounded. He called an ambulance and attempted to secure the area around the victim, but he had trouble keeping the crime scene under control because of the number of people in the vicinity.

At this point in time, the parade had halted just a few blocks north of Webster Street. The chief of police, who was marching with the parade, instructed the officers at the scene to pick up all visible evidence and to mark its location on the pavement so the parade could proceed through the crime scene. After collecting evi-

dence for approximately one-half hour, the police reopened the street to the parade, but they kept a small area where the victim had been found cordoned off with police tape. After the parade had passed through, detectives closed a larger section of the crime scene and performed a full investigation.

Detective Clarence Willoughby of the New Haven police department was assigned to the case. On Monday, May 20, 2002, Willoughby visited the defendant at his home. Willoughby did not notice any cuts or bruises on the defendant's face, even though the defendant claimed to have been in a violent fight. The defendant appeared to be upset, but he was courteous and cooperative. He agreed to accompany Willoughby to the police station, where he voluntarily gave a statement to the police. The defendant also helped the police search for the lost gun in the park. After an unsuccessful search for the weapon, Willoughby allowed the defendant to return home. Willoughby then applied for an arrest warrant and arrested the defendant at his home on May 22, 2002.

The defendant, who was charged with murder under General Statutes § 53a-54a, raised a claim of self-defense. Specifically, the defendant claimed that he feared the victim because he had carried a gun in the past, and because the defendant had heard that the victim was trying to obtain a gun in order to shoot him just days before the parade. In addition, the defendant recently had had several belligerent confrontations with the victim. Although the jury found the defendant not guilty of murder, it rejected his self-defense claim and found him guilty of the lesser included offense of intentional manslaughter in the first degree with a firearm under § 53a-55a. The defendant subsequently appealed from his conviction to this court pursuant to General

Statutes § 51-199 (b) (3).[1] Additional relevant facts will be set forth as necessary.

## I

## JURY INSTRUCTIONS ON CONSCIOUSNESS OF GUILT

The defendant first claims that the trial court improperly instructed the jury that the defendant's flight could be used as circumstantial evidence of consciousness of guilt. Although trial counsel did not object to this jury instruction, the defendant urges us to review his claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), which provides for appellate review of unpreserved constitutional errors if certain conditions are met.[2] In the alternative, he asks this court to exercise its supervisory authority either to abandon the flight instruction or to modify it to make it "even-handed." The state claims that the defendant has not raised a constitutional issue, and that we should not exercise our supervisory powers in the present case. We agree with the state.

At the outset, we set forth the standard of review. "The decision whether to give an instruction on flight,

[1] General Statutes § 51-199 provides in relevant part: "(b) The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[2] In *State* v. *Golding*, supra, 213 Conn. 239–40, we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail."

as well as the content of such an instruction, if given, should be left to the sound discretion of the trial court." *State* v. *Hines*, 243 Conn. 796, 816, 709 A.2d 522 (1998). "When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety . . . and judged by its total effect rather than by its individual component parts. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [It should] not [be] critically dissected in a microscopic search for possible error. . . . In this inquiry we focus on the substance of the charge rather than the form of what was said not only in light of the entire charge, but also within the context of the entire trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Alston*, 272 Conn. 432, 447, 862 A.2d 817 (2005).

A

We now turn to the defendant's first claim that we should review the flight instruction in the present case under *Golding*. Specifically, the defendant argues that an instruction on flight is unconstitutional in the context of a self-defense claim because it allows the jury to presume guilt from the defendant's actions in fulfilling his legal duty to retreat, which dilutes the state's burden to disprove self-defense beyond a reasonable doubt. The state responds that this consciousness of guilt claim is not reviewable because it fails the second prong of *Golding*, which requires that an unpreserved claim be "of constitutional magnitude alleging the violation of a fundamental right . . . ." *State* v. *Golding*, supra, 213 Conn. 239. We agree with the state and decline to reach the merits of the defendant's claim.

This court repeatedly has held that consciousness of guilt claims, including claims involving flight instruc-

tions, are not constitutional and, therefore, are not subject to *Golding* review. *State* v. *Rowe*, 279 Conn. 139, 149–52, 900 A.2d 1276 (2006) (consciousness of guilt claim involving flight instruction was unpreserved evidentiary claim); *State* v. *Alston*, supra, 272 Conn. 448–49 (consciousness of guilt issues not constitutional); see also *State* v. *Camera*, 81 Conn. App. 175, 188–89, 839 A.2d 613 (2004) (consciousness of guilt claims evidentiary rather than constitutional in nature), cert. denied, 268 Conn. 910, 845 A.2d 412 (2004); *State* v. *Lacks*, 58 Conn. App. 412, 424, 755 A.2d 254 (consciousness of guilt issues not constitutional), cert. denied, 254 Conn. 919, 759 A.2d 1026 (2000). In *Alston*, we explained that "jury instructions that *mandate* inferences adverse to a defendant may sufficiently implicate constitutional rights to satisfy the second condition of *Golding*." (Internal quotation marks omitted.) *State* v. *Alston*, supra, 448. Such instructions may violate the defendant's due process rights by relieving the state of its burden of proving every element of the crime beyond a reasonable doubt. *State* v. *Bunkley*, 202 Conn. 629, 656, 522 A.2d 795 (1987). Instructions that allow a *permissive* inference do not, however, implicate a defendant's constitutional rights. *State* v. *Alston*, supra, 448. Because properly framed consciousness of guilt instructions allow only a permissive inference, they are not subject to *Golding* review.[3] Id., 448–49; see also *State*

---

[3] We note that the trial court's instruction in the present case correctly allowed a permissive inference. The trial court instructed the jury: "Now, the law in this state recognizes a principle known as admission by conduct. Certain conduct of a person *may be considered by you* to show a guilty knowledge or consciousness of guilt. When a person is on trial for a criminal offense, it is proper to show his conduct subsequent to the alleged criminal offense which may fairly have been influenced by that act.

"Flight, when unexplained, *can indicate consciousness of guilt if the facts and the circumstances support it. If you find* the defendant did flee or did hide from the police or from others following the commission of the crimes alleged, *you may find* that such actions tend to show a guilty connection with the crime. In other words, any actions of the defendant subsequent to the criminal act alleged, which you find show a guilty knowledge influenced by the criminal act itself, *may be used by you* as circumstan-

v. *Adams*, 225 Conn. 270, 287–89, 623 A.2d 42 (1993) (because consciousness of guilt instruction allowed permissive inference, claim that instruction unconstitutionally diluted state's burden of proof had no merit).

The defendant argues that this case is distinguishable from *Alston* because it involves a claim of self-defense. Specifically, he argues that it is unfair to give a flight instruction when a defendant claims self-defense because the law requires a person to retreat from a confrontation when he or she can do so safely. See General Statutes § 53a-19 (b) (1).[4] Thus, it is natural for a defendant who is raising a self-defense claim to introduce evidence of flight in support of that claim. According to the defendant, instructing the jury that it may use the *same* evidence as circumstantial proof of the defendant's guilt tends to undermine the self-defense claim and unfairly dilutes the state's burden of proof.

We are not persuaded. We repeatedly have recognized that evidence of flight from the scene of a crime inherently is ambiguous. See *State* v. *Scott*, 270 Conn. 92, 104–105, 851 A.2d 291 (2004) (recognizing there may be innocent explanations for flight), cert. denied, 544 U.S. 987, 125 S. Ct. 1861, 161 L. Ed. 2d 746 (2005); *State* v. *Coltherst*, 263 Conn. 478, 521–22, 820 A.2d 1024 (2003) (recognizing ambiguous nature of flight evidence); *State* v. *Kelly*, 256 Conn. 23, 54, 770 A.2d 908 (2001) (same). That ambiguity does not render a flight instruction improper. See *State* v. *Scott*, supra, 105–106 ("[i]f there

---

tial evidence of the defendant's guilt, that is, if you find the defendant's acts or flight show consciousness of guilt, *you may use that conclusion as independent evidence of guilt along with the other facts in the case* to determine whether he has been proven guilty of the crime charged." (Emphasis added.)

[4] General Statutes § 53a-19 (b) provides in relevant part: "[A] person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating . . . ."

is a reasonable view of the evidence that would support an inference that [the defendant fled] because he was guilty of the crime and wanted to evade apprehension—even for a short period of time—then the trial court is within its discretion in giving [a flight] instruction"). Moreover, we conclude that the defendant's reliance on § 53a-19 (b) (1) in support of his claim is misplaced. The section of the statute that pertains to the duty to retreat merely allows the state to rebut a claim of self-defense by showing that the defendant could have retreated safely *before* using deadly force. It does not follow that a defendant is statutorily or constitutionally entitled to use evidence of retreat *after* using deadly force to bolster a claim of self-defense without permitting the jury to consider other possible reasons for the flight. As in other contexts, evidence of flight after using deadly force inherently is ambiguous and does not logically compel a conclusion that the reason for the flight was self-defense. Although it may be prudent, as a general rule, for the trial court to use greater caution in giving a consciousness of guilt instruction when a defendant has claimed self-defense, we do not believe that such instructions inherently are unconstitutional.

Although the defendant notes that several other jurisdictions have rejected flight instructions in the context of self-defense claims, those jurisdictions were not considering the constitutional implications of consciousness of guilt jury instructions. In *Lefevre* v. *State*, 585 So. 2d 457, 458–59 (Fla. App. 1991), for example, the court treated the defendant's consciousness of guilt claim as an evidentiary issue. See id. (flight instruction unwarranted because evidence suggested defendant did not leave scene to evade capture); see also *Webb* v. *State*, 609 So. 2d 728, 729 (Fla. App. 1992) (flight instruction inappropriate because evidence suggested defendant did not leave scene to avoid apprehension); *State* v. *Wrenn*, 99 Idaho 506, 509, 584 P.2d 1231 (1978) (because

defendant and companion were transients, departure from state did not support flight instruction); *People* v. *Mercer*, 210 Cal. App. 2d 153, 162, 26 Cal. Rptr. 502 (1962) (defendant's flight did not constitute evidence of guilt in case at hand); *People* v. *Choy Ah Sing*, 84 Cal. 276, 277, 24 P. 379 (1890) (under facts of case, flight instruction improper).

"Unpreserved nonconstitutional claims such as this do not warrant special consideration simply because they bear a constitutional label." (Internal quotation marks omitted.) *State* v. *Adams*, supra, 225 Conn. 289–90. Accordingly, we reject the defendant's claim that we should review the consciousness of guilt instruction under *Golding*.

B

The defendant next claims that we should exercise our supervisory authority to abandon the flight instruction altogether or to modify it to include the caveat that there may be innocent explanations for a defendant's flight. We disagree.

"Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis in original; internal quotation marks omitted.) *State* v. *Hines*, supra, 243 Conn. 815.

We repeatedly have refused to exercise our supervisory authority to alter or to bar instructions concerning flight. See, e.g., *State* v. *Figueroa*, 257 Conn. 192, 197, 777 A.2d 587 (2001) (refusing to exercise supervisory authority to prohibit flight instructions); *State* v. *Hines*,

supra, 243 Conn. 814–16 (refusing to invoke supervisory authority to require that flight instructions include innocent explanations); *State* v. *Groomes*, 232 Conn. 455, 472–74, 656 A.2d 646 (1995) (refusing to abandon precedent allowing use of flight instructions). The defendant has not presented us with a compelling reason to overturn this recent and well established precedent. Accordingly, we decline the defendant's invitation to exercise our supervisory authority in the present case.

II

PROSECUTORIAL MISCONDUCT

We next address the defendant's claim that prosecutorial misconduct deprived him of his constitutional right to a fair trial. Specifically, the defendant claims that the prosecutor committed misconduct during his closing arguments by: (1) bolstering his own credibility; (2) impugning defense counsel; and (3) expressing his personal belief in the strength of the state's case and the credibility of the state's witnesses. Although we conclude that one of the prosecutor's remarks constituted misconduct, we disagree with the defendant's claim that this misconduct deprived him of a fair trial.

Before we address the merits of the defendant's claims, we briefly set forth the standard of review and the general framework of the law governing claims of prosecutorial misconduct. At the outset, we note that the defendant's trial counsel did not object to the remarks at issue in this appeal. Although these claims are unpreserved, "we have recently stated that a defendant who fails to preserve claims of prosecutorial misconduct need not seek to prevail under the specific requirements of *State* v. *Golding*, [supra, 213 Conn. 239–40], and, similarly, it is unnecessary for a reviewing court to apply the four-prong *Golding* test. . . . The reason for this is that the defendant in a claim of prosecutorial misconduct must establish that the prosecu-

torial misconduct was so serious as to amount to a denial of due process . . . . In evaluating whether the misconduct rose to this level, we consider the factors enumerated by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).[5] . . . The consideration of the fairness of the entire trial through the *Williams* factors duplicates, and, thus makes superfluous, a separate application of the *Golding* test." (Citations omitted; internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 360–61, 897 A.2d 569 (2006).

"Furthermore, the application of the *Golding* test to unchallenged incidents of misconduct tends to encourage analysis of each incident in isolation from one another. Because the inquiry must involve the entire trial, all incidents of misconduct must be viewed in relation to one another and within the context of the entire trial. The object of inquiry before a reviewing court in [due process] claims involving prosecutorial misconduct, therefore, is . . . only the fairness of the entire trial, and not the specific incidents of misconduct themselves. Application of the *Williams* factors provides for such an analysis . . . ." (Internal quotation marks omitted.) *State* v. *Spencer*, 275 Conn. 171, 178, 881 A.2d 209 (2005). Accordingly, we apply only the *Williams* factors to unpreserved claims of prosecutorial misconduct.

"This does not mean, however, that the absence of an objection at trial does not play a significant role in the application of the *Williams* factors. To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense coun-

---

[5] The *Williams* factors are: "[1] the extent to which the misconduct was invited by defense conduct or argument . . . [2] the severity of the misconduct . . . [3] the frequency of the misconduct . . . [4] the centrality of the misconduct to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 540.

sel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial. . . . [Thus], the fact that defense counsel did not object to one or more incidents of misconduct must be considered in determining whether and to what extent the misconduct contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." (Internal quotation marks omitted.) Id., 179.

"[I]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial . . . ." (Internal quotation marks omitted.) *State* v. *Coney*, 266 Conn. 787, 808, 835 A.2d 977 (2003).

In the present case, the defendant claims that the prosecutorial misconduct occurred during closing arguments. "As we previously have recognized, prosecutorial misconduct of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a

prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Santiago*, 269 Conn. 726, 734–35, 850 A.2d 199 (2004). Having set forth the applicable law, we now turn to the question of whether the prosecutor's remarks in the present case constituted misconduct. We will address each claim of misconduct in turn.

A

Remarks Bolstering the Prosecutor's Own Credibility

The defendant first claims that the prosecutor improperly bolstered his own credibility at the beginning of his closing argument by making the following remarks: "And I want to echo what Judge Thompson just told you, if I say something in my argument to you and it does not square with what you remember from the testimony or from the evidence that you will have in the jury room with you, it's your recollections and not what I say that counts. *And I promise you that I'm not misstating something on purpose, it's an honest mistake. I'm not trying to trick you. You are the last group of people that I would trick at this point or try to trick at this point if I was to trick at all.*" (Emphasis added.) The defendant claims that this comment was improper because the prosecutor implicitly was telling the jury to trust him because he would speak only the truth. He further claims that, throughout the trial and closing arguments, the prosecutor reiterated this message of trustworthiness, thereby tainting the entire trial. The state responds that these remarks were "nothing more than an innocuous formality" and an "apology in advance for any misstatement of the facts . . . ." We agree with the state.

At the outset, we set forth the law governing this claim. Many courts have concluded that it is improper for a prosecutor to inject his or her own credibility into a trial. See *Floyd* v. *Meachum*, 907 F.2d 347, 354 (2d Cir. 1990) (misconduct when prosecutor "asked jury to pass on her personal integrity and professional ethics before deliberating on evidence"); *People* v. *Caballero*, 126 Ill. 2d 248, 272, 533 N.E.2d 1089 (1989) (prosecutor improperly placed own credibility in issue); *Commonwealth* v. *Thomas*, 401 Mass. 109, 116, 514 N.E.2d 1309 (1987) (comments about prosecutor's own credibility

improperly created "false issue of the reliability and credibility of counsel"); *Davis* v. *State*, 494 So. 2d 851, 856–57 (Ala. Crim. App. 1986) (prosecutor must not argue own credibility to jury); *State* v. *Sharp*, 101 Idaho 498, 508, 616 P.2d 1034 (1980) (prosecutor's comments about his personal integrity improper, but not prejudicial); *People* v. *Lovello*, 1 N.Y.2d 436, 439, 136 N.E.2d 483, 154 N.Y.S.2d 8 (1956) (prosecutor cannot support case "by his own veracity and position"). In each of these cases, the court concluded that the prosecutor's comments were improper because they turned the prosecutor's own credibility into an issue in the case, thereby inviting the jury to "view its verdict as a vindication of the prosecutor's integrity rather than as an assessment of guilt or innocence based upon the evidence presented at trial." *Floyd* v. *Meachum*, supra, 354. Such comments also constitute unsworn testimony that may improperly suggest to the jury that the prosecutor's confidence in his case derives from his or her secret knowledge of facts not in evidence. See *State* v. *Singh*, 259 Conn. 693, 713, 793 A.2d 226 (2002) (improper for prosecutor to give own opinion because jury may speculate opinion was precipitated by secret knowledge of facts not in evidence).

In *Floyd*, the court held that the prosecutor's comments were improper because she bolstered her case by placing her own integrity, as an officer of the state, into issue. *Floyd* v. *Meachum*, supra, 907 F.2d 350–51. Specifically, she said: "Ladies and gentlemen, let me tell you, if you believe I've intentionally put on any perjured testimony in this case, if you believe, ladies and gentlemen of the jury, that I've lied to you, that I have misrepresented facts, then even though I'm not here as Mary Galvin—I am here as the prosecutor for the people of the [s]tate of Connecticut—for my ethos, I have to say to you if you believe that, acquit this man." (Internal quotation marks omitted.) Id. Similarly, the

Alabama Court of Criminal Appeals concluded that it was improper for the prosecutor to tell the jury that if they found the defendant not guilty, they would be calling him a liar. *Davis* v. *State*, supra, 494 So. 2d 856; see also *People* v. *Caballero*, supra, 126 Ill. 2d 272 (prosecutor improperly remarked " 'I didn't go to law school for four years at night to put innocent men in the penitentiary' "); *Commonwealth* v. *Thomas*, supra, 401 Mass. 114–15 (prosecutor improperly remarked "[i]f you disbelieve those persons, then I am, indeed, a bad person; because I have aided in a conspiracy to convict an innocent person" [internal quotation marks omitted]).

In the present case, the prosecutor did not pit his own credibility against that of the defendant or imply that he spoke only the truth. Instead, he merely asked the jury to give him the benefit of the doubt if he misstated something. He asked the jury to trust him in the sense that it should not assume that he intentionally was trying to trick the jury. Unlike the prosecutors in the aforementioned cases, he never asked the jury to trust his professional judgment and assessment of the evidence, nor did he intimate that his version of the facts was the unbiased truth. To the contrary, he told the jury that if its recollection of the evidence conflicted with his closing argument, the jury's recollection should prevail. Accordingly, the prosecutor did not improperly vouch for his own credibility when he made these comments.[6]

---

[6] The defendant points to several other portions of the transcript to support his claim that the prosecutor tainted the entire trial with the message that he was honest. First, he objects to the prosecutor's statement during closing argument that he was not trying to trick the defendant with language during cross-examination. Second, the defendant claims that the prosecutor improperly bolstered his own credibility during his cross-examination of two defense witnesses by telling them that he was not trying to trick or confuse them.

We conclude that these comments were not meant to bolster the prosecutor's credibility with the jury, nor was it likely they had that effect. With respect to the first comment, which was made in the context of a discussion

## B

### Remarks Impugning Defense Counsel

The defendant next claims that the prosecutor improperly impugned defense counsel during his rebuttal by making the following remarks: "*It seems to [have] become fashionable of late to put the police department on trial; let's try the cops.* Nobody suggested that their investigation was perfect, but *it's a desperate move to attack the police in a situation such as this. It's diverting attention from the real issue,* the real issue that the defendant shot twice and killed the victim. *Putting the cops on trial is a desperate move; it tries, it tries to make you think that the cops did something wrong,* maybe they didn't do a perfect job, but other than the situation they had at the time, a near riot, there were— I think their analysis showed that there was little else that they need to do but have a parade go through." (Emphasis added.) The state argues that these comments either were permissible or, at worst, were isolated, harmless observations about nonpertinent facts not in evidence. We conclude that these remarks constituted misconduct.

It has been held improper for the prosecutor to impugn the role of defense counsel. See *United States* v. *Friedman*, 909 F.2d 705, 709 (2d Cir. 1990). Such comments invite the jury "to conclude that everyone the [g]overnment accuses is guilty, that justice is done only when a conviction is obtained, and that defense counsel are impairing this version of justice by having the temerity to provide a defense and to try to 'get' the

of the defendant's credibility, it is clear that the prosecutor was merely pointing out how nervous and evasive the defendant was during cross-examination, even in the face of straightforward questions. The remaining comments, which were directed toward defense witnesses during cross-examination, were made to urge a recalcitrant witness to answer the question posed and in response to a witness' claim that the prosecutor was confusing her.

guilty 'off.' " Id.; see also *State* v. *Young*, 76 Conn. App. 392, 404, 819 A.2d 884 (prosecutor expected to refrain from impugning defense counsel, either directly or by implication), cert. denied, 264 Conn. 912, 826 A.2d 1157 (2003).

In particular, "[i]t is improper for a prosecutor to tell a jury, explicitly or implicitly, that defense counsel is employing standard tactics used in all trials, because such an argument relies on facts not in evidence and has no bearing on the issue before the jury, namely, the guilt or innocence of the defendant." *State* v. *Young*, supra, 76 Conn. App. 404. For example, in *Young*, the Appellate Court held that it was misconduct for a prosecutor to suggest that defense attorneys always attack in-court eyewitness identifications as being either too certain or not certain enough. Id. In *Young*, the prosecutor also improperly stated: "So, you know, I always love it when counsel stands up and says, 'Well, of course, you're going to make an in-court [identification].' That's always a favorite argument to make." Id., 402. Likewise, in *State* v. *Brown*, 71 Conn. App. 121, 129, 800 A.2d 674, cert. denied, 261 Conn. 940, 808 A.2d 1133 (2002), the Appellate Court concluded that it was improper for the prosecutor to characterize one of the defendant's arguments as a " 'smoke screen' " used by all defense attorneys in order to delude juries.

In the present case, the prosecutor stated that it was "fashionable of late to put the police department on trial . . . ." We conclude that, when he did so, he improperly implied that criticizing the police investigation is a standard tactic, used by all defense attorneys to divert a jury's attention away from the "real" issues in a case. Furthermore, by characterizing the defendant's argument as a "desperate move," the prosecutor improperly suggested that defense counsel had resorted to cheap, unethical tricks instead of legitimate arguments. See *State* v. *Orellana*, 89 Conn. App. 71, 103, 872 A.2d 506,

cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005) (prosecutor improperly implied defense counsel's argument was deceptive and without basis in fact or reason). Accordingly, we conclude that these remarks constituted misconduct.

C

### Expressions of Personal Opinion about the Strength of the State's Case and the Credibility of Witnesses

The defendant's final claim is that the prosecutor improperly expressed his personal opinion about the strength of his case and the credibility of witnesses. After reviewing each alleged instance of misconduct, we conclude that the prosecutor did not engage in misconduct when he made these comments during closing arguments.

We begin with a discussion of the law governing these claims. "[A] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Bermudez*, 274 Conn. 581, 590, 876 A.2d 1162 (2005), on remand, 95 Conn. App. 577, 897 A.2d 661 (2006). It is not, however, "improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Colon*, 272

Conn. 106, 250, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

Although prosecutors generally should try to avoid using phrases that begin with the pronoun "I," such as "I think" or "I believe," we recognize that the "use of the word 'I' is part of our everyday parlance and . . . because of established speech patterns, it cannot always easily be eliminated completely from extemporaneous elocution." *State* v. *Brown*, supra, 71 Conn. App. 135; see also *State* v. *Colon*, supra, 272 Conn. 250 (use of phrases such as " 'I would think' " does not always signify improper expression of personal opinion). Furthermore, "[t]he state's attorney should not be put in the rhetorical straightjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows . . . ." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 269 Conn. 751. Therefore, if it is clear that the prosecutor is arguing from the evidence presented at trial, instead of giving improper unsworn testimony with the suggestion of secret knowledge, his or her occasional use of the first person does not constitute misconduct. Id., 750–51; see also *State* v. *Bermudez*, supra, 274 Conn. 591 ("[w]e . . . never have categorically barred counsel's use of such rhetorical devices . . . as long as there is no reasonable likelihood that the particular device employed will confuse the jury or otherwise prejudice the opposing party" [internal quotation marks omitted]); *State* v. *Santiago*, supra, 751 ("[w]e must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand" [internal quotation marks omitted]).

With these principles in mind, we now turn to the defendant's specific claims. The defendant first claims that the prosecutor improperly expressed his own opinion that the defendant was guilty when he made the following remarks: "Try to determine a person's intent from the result of their actions. When you bring a pistol to a fistfight, and you cause the death of another person with a shot to the heart and a shot to the back, that says something about his intent. Was he trying to cause serious physical injury? *I don't think so.*" (Emphasis added.) The defendant also claims that it was misconduct for the prosecutor to say: "Was it reasonable for [the defendant] to believe that [the victim] was about to use deadly physical force? *No it wasn't.*" (Emphasis added.)

We conclude that, in the first instance, the prosecutor merely used a rhetorical device to suggest an inference that could be drawn from the evidence. Moreover, this comment did not prejudice the defendant. At this point in his argument, the prosecutor was trying to persuade the jury that the defendant was guilty of murder instead of a lesser included offense. The jury was not, however, persuaded because it acquitted the defendant of murder and convicted him of a lesser charge.

We also conclude that the second statement does not constitute misconduct. In the preceding lines of the transcript, the prosecutor clearly stated that this was a conclusion the jury could reach from a "common sense review of the evidence . . . ." In the lines that followed, the prosecutor discussed evidence that established the unreasonableness of the defendant's belief that the victim was about to use deadly force. We conclude that the jury could not have mistaken these comments for an expression of the prosecutor's personal belief in the defendant's guilt, for they clearly were attempts to persuade the jury to draw inferences based on the evidence.

The defendant next claims that the prosecutor improperly expressed his own opinion about the credibility of two of the state's witnesses, Willoughby and Reed.[7] He argues that the prosecutor's remarks about these witnesses clearly were improper under *State* v. *Williams,* 41 Conn. App. 180, 674 A.2d 1372, cert. denied, 237 Conn. 925, 677 A.2d 950 (1996). We disagree.

"[A] prosecutor may properly comment on the credibility of a witness where . . . the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Holmes,* 64 Conn. App. 80, 93, 778 A.2d 253, cert. denied, 258 Conn. 911, 782 A.2d 1249 (2001); see also *State* v. *Burton,* 258 Conn. 153, 169–70, 778 A.2d 955 (2001). In addition, "the state may properly argue that the witnesses had no apparent motive to lie." *State* v. *Burton,* supra, 170; see also *State* v. *Warholic,* supra, 278 Conn. 365 (listing Connecticut cases establishing this principle).

In *State* v. *Williams,* supra, 41 Conn. App. 184, the Appellate Court concluded that it was improper for the prosecutor to make repeated bald assertions that the state's witnesses were honest. For example, the prosecutor in that case said: "I would submit to you [the jury] that all of these officers are extremely honest";

---

[7] With regard to Willoughby, the defendant refers to the following statement: "And you can't say that Willoughby in this case was biased against the defendant, because why? Because Willoughby testified that the defendant was remorseful and cooperative at that time. He said that he looked upset about the shooting, that was just a day after. So, Willoughby doesn't look like he has an ax to grind with the defendant. *He was, I think, if you will look at his testimony, honest and open with us.* So if he says he saw no swelling . . . ." (Emphasis added.)

The defendant objects to the following comment about Reed: "And this is why I suggest that you pay really close attention to what he says because if you examine his credibility, you will not find bias, you will not find prejudice, you will find an independent person who is there at the parade with his family."

"Detective [Nicholas] DeMatteis was very honest with you"; and "[the officers] all told you honestly what they saw." (Internal quotation marks omitted.) Id. The prosecutor also improperly told the jury that her office would not " 'stand by' " and allow a state's witness to testify falsely as to the defendant's identity. Id.

In the present case, the prosecutor did not make such bald assertions. When the prosecutor spoke about Willoughby, he referred to uncontested facts adduced at trial and his demeanor on the witness stand before suggesting that he was "honest and open with us." The prosecutor's remarks about Reed were in a similar vein. The prosecutor, in asking the jury to "pay really close attention to what [Reed] says," was discussing testimony indicating that Reed, unlike the other witnesses, had no personal connection to either the victim or the defendant. Accordingly, we conclude that the prosecutor's remarks about Willoughby and Reed were not improper.

Finally, the defendant claims that the prosecutor committed misconduct when he made the following remarks about the defendant's credibility: "Again, when I talked before about a witness' demeanor, what you could learn from that, he was very easy to understand during his direct examination by his own lawyer. When I was questioning him, *you saw how evasive he was.* And how we were talking, I remember exactly, we were talking about, do you believe that you shot [the victim]? And then he was going back and forth and *he tried to squirm* and talking about belief, and he believes he shot [the victim], he is not positive, he believes, yet earlier he had aimed at [the victim]. He said he aimed at [the victim]. He told us he didn't even know who shot [the victim]. He did not see the victim with the gun, though he does admit that. He does admit that the victim, he did not see any weapons whatsoever on [the victim] at first. But when he used the word 'believed,'

*he was being coy with us, he was fooling around with language, and I wasn't trying to trick him on language when I was asking him those questions.*" (Emphasis added.) Specifically, the defendant claims that, in making these remarks, the prosecutor improperly expressed his personal opinion that the defendant was guilty and discussed facts not in evidence by describing his own trial tactics. We disagree.

As we previously stated, "a prosecutor may not interject personal opinion about the credibility or truthfulness of a witness, [but] he may comment on the credibility of the witness as long as the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Dupigney*, 78 Conn. App. 111, 124, 826 A.2d 241, cert. denied, 266 Conn. 919, 837 A.2d 801 (2003). When the prosecutor described the defendant in this case as being "coy," "evasive," and "trying to squirm," he did not express his personal opinion that the defendant was guilty. He merely described the defendant's demeanor during cross-examination, which the jury had observed and could assess independently. Because these comments were grounded in the evidence, as they were in *Dupigney*, they were not an improper expression of personal opinion. See id., 124–25.

The defendant also argues that, under *State* v. *Sinvil*, 270 Conn. 516, 523–24, 853 A.2d 105 (2004), it was misconduct for the prosecutor in this case to say that he "wasn't trying to trick [the defendant] on language." We disagree. In *Sinvil*, the prosecutor made several remarks during closing argument about his performance during trial, and the state conceded that those remarks were improper. Id., 523. Specifically, the prosecutor told the jury that he had failed to pursue an important line of questioning because he was " 'kind of burnt out' " and " 'had a hard time focusing on the trial.' " Id., 523 n.8. These comments were improper

because they referred to facts not in evidence and distracted the jury from the issues in the case by diverting its attention to the prosecutor's trial strategy and thought processes.

Although the comment made in the present case arguably was similar, it did not overstep the bounds of propriety. Although the prosecutor referred to his own intent and trial strategy, these references did not distract the jury from the issues in the case. To the contrary, the prosecutor focused the jury's attention on an important issue in the case, the defendant's credibility, by pointing out that the defendant was evasive, even when faced with straightforward questions. The prosecutor did not discuss facts not in evidence because the jury witnessed the cross-examination and could determine for itself whether the questions were as straightforward as the prosecutor claimed. Although we do not condone the phrasing of these remarks in the first person, we already have noted that the occasional use of the first person during closing arguments is acceptable. See, e.g., *State* v. *Brown*, supra, 71 Conn. App. 135. In addition, "[w]e are mindful . . . that closing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 368. Accordingly, we conclude that the prosecutor did not engage in misconduct by expressing his personal opinion about witness credibility or the strength of his case.

## D

## Due Process Analysis

Having identified one instance of prosecutorial misconduct; see part II B of this opinion; we now turn to the question of whether this misconduct deprived the defendant of a fair trial. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . [M]oreover . . . [a defendant is not entitled to prevail when] the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 269 Conn. 733–34. "The question of whether the defendant has been prejudiced by prosecutorial misconduct, therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 396.

As we previously have stated, our due process analysis is guided by the *Williams* factors; see footnote 5 of this opinion; with due consideration of whether the defendant objected to the misconduct at trial. *State* v. *Warholic*, supra, 278 Conn. 362. The first factor is whether the misconduct was invited. Although defense counsel criticized the quality of the police investigation throughout the trial and during closing arguments, his comments did not *invite* the misconduct because they

were not improper. See *United States* v. *Friedman*, supra, 909 F.2d 709 (prosecutorial misconduct not invited by defense counsel's vigorous summation focusing on evidence adduced at trial); *State* v. *Santiago*, supra, 269 Conn. 757–58 (same); cf. *State* v. *Brown*, supra, 71 Conn. App. 130–31 (prosecutor's misconduct provoked by defense counsel's improper discussion of standard tactics employed by all prosecutors). Defense counsel's arguments were based on the evidence adduced at trial. He did not express his personal opinion, disparage the institutional role of the prosecutor or police, or otherwise make inappropriate comments that provoked an inappropriate response. Accordingly, we conclude that the prosecutor's misconduct was uninvited.

We next consider whether the misconduct, which consisted of isolated comments made during the prosecutor's rebuttal argument, was frequent or severe. When considering whether prosecutorial misconduct was severe, this court "consider[s] it highly significant that defense counsel failed to object to any of the improper remarks, request curative instructions, or move for a mistrial." *State* v. *Thompson*, 266 Conn. 440, 479, 832 A.2d 626 (2003). A failure to object demonstrates that defense counsel "presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." *State* v. *Reynolds*, 264 Conn. 1, 165, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). Because defense counsel did not object to the improper comments at trial, and the misconduct was not blatantly egregious or inexcusable; see *State* v. *Thompson*, supra, 480; we conclude that the misconduct in the present case was neither frequent nor severe.

We next consider the centrality of the misconduct to the critical issues in the case and to the strength of the state's case. The critical issue in this case was whether

the defendant had acted in self-defense. The misconduct clearly was related to this critical issue. The defendant's criticism of the police investigation raised important questions about whether the prosecution had met its burden of disproving self-defense. By belittling this line of argument as a standard tactic employed by desperate defense attorneys, the prosecutor improperly asked the jury to ignore important facts such as the investigating officer's failure to collect the defendant's clothes or to examine his torso for injuries.

Nevertheless, even if the police investigation was imperfect, we conclude that the state's case was strong. Although the defendant claimed that he feared for his life during the fistfight because he was being stomped and beaten severely by the victim and his friends, the evidence adduced at trial suggested that the victim was bearing the brunt of the blows during the altercation. Reed, the only witness to the incident who testified that he did not know either the defendant or the victim, maintained that the victim, not the defendant, was on the defensive during the fight.[8] Although Reed admitted that he had forgotten many of the details concerning the incident, he consistently stated that the victim was on the ground being kicked and stomped.

In addition, Reed's testimony was corroborated by physical evidence. Cf. *State* v. *Warholic*, supra, 278 Conn. 397 (state's case weaker when not corroborated by physical evidence). Kanfer testified that the victim had multiple abrasions on his face and a split upper lip. He stated that although some of these injuries could have been caused by the victim's fall to the pavement

---

[8] In fact, Reed did not even remember seeing the defendant involved in the fighting. The first time Reed noticed the defendant was when he pulled out the gun and fired the shots, but Reed clearly remembered watching the victim being beaten.

after he had been shot, a single fall to the ground could not have caused all of the facial injuries. Kanfer further testified that some or all of the injuries could have been caused by punches and kicks inflicted before the victim was shot.

The physical evidence also belied the defendant's self-defense claim. The defendant testified that, during the incident, three people, including a 400 pound man, punched him in the face, causing him to fall to the ground before the stomping began. Willoughby testified, however, that he saw no evidence of bruising or swelling on the defendant's face when he interviewed him less than twenty-four hours after the incident. Willoughby's testimony was corroborated by police photographs of the defendant taken approximately three days after the incident. In those photographs, the defendant's face exhibits no signs of swelling or bruising.

We conclude that, although the state's case was not airtight, it was strong enough to support a conclusion that an isolated instance of prosecutorial misconduct did not deprive the defendant of a fair trial. See *State* v. *Stevenson*, 269 Conn. 563, 596, 849 A.2d 626 (2004) (evidence need not be overwhelming for state to have strong case); *State* v. *Thompson*, supra, 266 Conn. 482 (same).

Finally, we examine the sufficiency of the curative measures taken by the trial court. The court did not give a specific instruction directed toward the improper remarks. Because the defendant did not object to this misconduct at trial, however, he bears a significant degree of responsibility for the fact that this impropriety went uncured. *State* v. *Warholic*, supra, 278 Conn. 402. In addition, we note that a failure to object demonstrates that defense counsel "presumably [did] not view

the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." *State v. Reynolds*, supra, 264 Conn. 165.

Defense counsel may have chosen not to object to the comments for tactical reasons, but this possibility does not excuse defense counsel from the "responsibility . . . to object to perceived prosecutorial improprieties as they occur at trial . . . ." (Internal quotation marks omitted.) *State v. Warholic*, supra, 278 Conn. 402. Appellate review of prosecutorial misconduct claims "is not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address gross prosecutorial improprieties that clearly have deprived a criminal defendant of his right to a fair trial." *State v. Ceballos*, 266 Conn. 364, 414–15, 832 A.2d 14 (2003).

Moreover, although the trial court did not give specific instructions directed at the misconduct, the court's general instructions, which instructed the jury that arguments by counsel were not evidence, adequately addressed the improper remarks. See *State v. Young*, supra, 76 Conn. App. 406 (impact of prosecutorial misconduct lessened when trial court instructed jury that statements and arguments of counsel were not evidence).

Although the misconduct was uninvited, it was neither frequent nor severe; the state's case was strong; and, in light of the defendant's failure to object at trial, which may have been for tactical reasons, the jury instructions adequately addressed the impropriety. Accordingly, we conclude that the misconduct in the present case did not deprive the defendant of a fair trial.

The judgment is affirmed.

In this opinion the other justices concurred.