******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
PASQUALE E. CIULLO
(SC 19127)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald and Robinson, Js.

*Argued March 24—officially released October 7, 2014*

*Herald Price Fahringer*, pro hac vice, with whom, on the brief, were *Erica T. Dubno*, pro hac vice, and *Edward J. Gavin*, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *James Bernardi*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

EVELEIGH, J. The defendant, Pasquale E. Ciullo, appeals from the judgment of the Appellate Court affirming the trial court's judgment of conviction, rendered after a jury trial, of two counts of unlawful restraint in the first degree in violation of General Statutes § 53a-95.[1] *State* v. *Ciullo*, 140 Conn. App. 393, 395–96, 59 A.3d 293 (2013). In this certified appeal, the defendant claims that the prosecutor engaged in certain improprieties that deprived him of his due process right to a fair trial. Upon a consideration of the entire record, we conclude that the instances of alleged prosecutorial impropriety identified by the defendant did not affect the fairness of the trial or prejudice the defendant. Accordingly, we affirm the judgment of the Appellate Court.

The opinion of the Appellate Court appropriately sets forth the following facts that the jury reasonably could have found. "The defendant owned and rented out a house located at 172 Byram Shore Road in Greenwich. In May, 2007, the defendant and his neighbor, Rose Pinchuk, were involved in a dispute over a stone wall and pillars that border their two properties. This dispute resulted in the use of attorneys and a survey being conducted to determine the exact location of the defendant's property line.

"On July 4, 2007, Pinchuk drove to Port Chester, New York, and hired two day laborers, Victor Illescas and Job Diaz,[2] and drove them to her house. Pinchuk directed Diaz and Illescas to install a fence, which followed her home's property line and continued into the driveway of the defendant's house. Pinchuk supplied Illescas and Diaz with the materials and tools necessary for the fence extension, including a pickax, shovel, rake and iron bar. Pinchuk and the defendant's neighbor, Martin Hyman, observed the laborers digging holes in the driveway, and Hyman called the defendant's place of residence for the purpose of reporting these happenings. When the defendant's son, Angelo Ciullo, answered the telephone at the defendant's home, Hyman informed him of the fence construction, and urged [Angelo Ciullo] to call the police due to the property damage he believed was being caused by the work of Illescas and Diaz.

"After receiving this telephone call, the defendant and [Angelo Ciullo] drove a pickup truck to the defendant's house on Byram Shore Road and brought the truck to a sudden stop where Illescas and Diaz were working in close proximity to each other. The defendant and Angelo Ciullo left the truck, drew Walther PPK semiautomatic pistols from their holsters and began yelling at the laborers. During these initial moments of the confrontation, the defendant pulled back his pistol's slide . . . and he and Angelo Ciullo pointed their pis-

tols at Illescas. The defendant and [Angelo Ciullo] then approached Illescas, and the defendant grabbed Illescas by the neck, pointed his pistol at Illescas' [neck] and ordered him to sit down. While Diaz initially ran behind Pinchuk, who was standing twelve to thirteen feet away and was calling 911 on her cell phone, he soon halted and sat down after Angelo Ciullo pointed his pistol at him. When Pinchuk screamed and ran away, the defendant instructed Angelo Ciullo to hold Illescas and Diaz together as he picked up a shovel and chased after Pinchuk along Byram Shore Road to a stone patio around the back of a neighboring house where Pinchuk fell to the ground.

"When the police arrived at the scene, they encountered the defendant and Angelo Ciullo standing near Illescas and Diaz. The defendant told the police that he had instructed the laborers to stop working on his property, that he and Pinchuk had previously disagreed over the boundary separating their property and that Pinchuk had been present when they arrived at the scene but had run away. The police located Pinchuk lying on the steps of the backyard patio of the house where she had run while being pursued by the defendant. On examination, the police discovered that she had a lacerated left palm and bruising on her legs. A subsequent police search of the defendant's pickup truck revealed that a wooden billy club and baseball bats were stored in the cab of the truck. The police then arrested the defendant and Angelo Ciullo."[3] Id., 396–98.

The record reveals the following additional facts. After the defendant and Angelo Ciullo exited the car, the defendant repeatedly yelled profanities at the laborers, turned off the safety mechanism on his gun, and displayed the gun to the laborers constantly, lifting the gun out of its holster enough to place his hand around the trigger guard.[4] The defendant surrendered his gun to a responding police officer with the safety off, a hollow point bullet in the chamber, and a full magazine loaded into the gun.

The opinion of the Appellate Court appropriately sets forth the procedural history. "The state charged the defendant by way of an amended information with three counts of unlawful restraint in violation of § 53a-95, one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and one count of illegal possession of a weapon in a motor vehicle in violation of General Statutes [Rev. to 2007] § 29-38 (a). The court instructed the jury on assault, unlawful restraint and the weapon charge. The court also instructed the jury, at the defendant's request, on the law regarding the defense of premises [civilian arrest] and self-defense. Following deliberations, the jury found the defendant guilty of three counts of unlawful restraint but not guilty of the assault charge and the weapon charge. The trial court, after accepting the jury's verdict, sentenced the

defendant to concurrent terms of five years incarceration on the unlawful restraint charges for a total effective sentence of five years incarceration." Id., 398. The defendant appealed the judgment of conviction to the Appellate Court.

On appeal to the Appellate Court, the defendant claimed, inter alia, that the prosecutor engaged in improprieties that deprived him of a fair trial.[5] Id., 395–96. The Appellate Court found that the prosecutor's statements were not improper and did not deprive the defendant of his right to a fair trial, though it did reverse the defendant's conviction for unlawful restraint of Pinchuk, citing to insufficient evidence to support the verdict. Id., 405, 415. This appeal followed.[6]

On appeal to this court, the defendant claims that the prosecutor improperly: (1) shifted the burden of proof to the defense; (2) vouched for the credibility of the state's witnesses; (3) denigrated the defense and impugned the credibility of the defendant's testimony; and (4) appealed to the jurors' emotions. The defendant claims that the sum of the prosecutor's alleged improprieties deprived him of his due process right to a fair trial. The state claims that the prosecutor's statements were not improper and, even assuming they were, such improprieties did not violate the defendant's due process right to a fair trial. We agree with the state and affirm the judgment of the Appellate Court, albeit for different reasons.

Before we address the merits of the defendant's claims, we set forth the standard of review and the law governing claims of prosecutorial impropriety. "[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [an impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [an impropriety is an impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial . . . ." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 428, 902 A.2d 636 (2006).

"[I]t is unnecessary for a reviewing court to apply the four-prong *Golding*[7] test. . . . The reason for this is that the defendant in a claim of prosecutorial [impropriety] must establish that the prosecutorial [impropriety] was so serious as to amount to a denial of due process . . . . In evaluating whether the [impropriety] rose to this level, we consider the factors enumerated by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).[8] . . . The consideration of the fairness of the entire trial through the *Williams* factors duplicates, and, thus makes superfluous, a separate

application of the *Golding* test." (Footnotes altered; internal quotation marks omitted.) *State* v. *Luster*, supra, 279 Conn. 426–27.

The state asserts that the defendant raises previously unreviewed examples of prosecutorial improprieties for the first time on appeal to this court. Noting that the Appellate Court ruled on the defendant's claims of prosecutorial impropriety only with respect to vouching for the credibility of the state's witnesses, the state asserts that we should disregard those alleged improprieties that do not fall within the category of "vouching." We disagree.

It is well settled that "a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of [*Golding*]. . . ." (Internal quotation marks omitted.) *State* v. *Luster*, supra, 279 Conn. 426. "Furthermore, the application of the *Golding* test to unchallenged incidents of [impropriety] tends to encourage analysis of each incident in isolation from one another. Because the inquiry must involve the entire trial, all incidents of [impropriety] must be viewed in relation to one another and within the context of the entire trial. The object of inquiry before a reviewing court in [due process] claims involving prosecutorial [impropriety], therefore, is . . . only the fairness of the entire trial, and not the specific incidents of [impropriety] themselves. Application of the *Williams* factors provides for such an analysis . . . .

"This does not mean, however, that the absence of an objection at trial does not play a significant role in the application of the *Williams* factors. To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial. . . . [Thus], the fact that defense counsel did not object to one or more incidents of [impropriety] must be considered in determining whether and to what extent the [impropriety] contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." (Citation omitted; internal quotation marks omitted.) Id., 427–28.[9]

In the present case, the defendant claims that the prosecutorial improprieties occurred during the state's closing argument and rebuttal. "As we previously have recognized, prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however, counsel] must be allowed a generous latitude in argument, as the limits of legitimate argu-

ment and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) Id., 428–29.

## I

Having set forth the applicable law, we now turn to the question of whether the prosecutor's remarks in the present case constituted prosecutorial impropriety. The defendant claims that the prosecutor improperly: (1) shifted the burden of proof to the defense; (2) vouched for the credibility of the state's witnesses; (3) denigrated the defense and impugned the credibility of the defendant's testimony; and (4) appealed to the jurors' emotions. We will address each claim of prosecutorial impropriety in turn, setting forth additional facts as needed.

## A

### Shifting the Burden of Proof to the Defense

The defendant first claims that the prosecutor, in his closing argument, shifted the burden of proof to the defense in violation of *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), when he said that the "testimony [of the defendant and Angelo Ciullo] does nothing at all to create a doubt in this case."[10] The state responds that this comment was isolated and that, thereafter, the prosecutor correctly expressed the burden of proof multiple times. We agree with the state.

Viewing the comment in the context of the prosecutor's closing argument, we conclude that the prosecutor's comment was not improper. The prosecutor began his closing argument by instructing the jury that "it is what His Honor says, not what I say that counts when

it comes to the law." He then correctly described the standard for reasonable doubt, concluding his closing argument by counseling the jurors to "listen to the law as His Honor gives it to you. If it conflicted with anything I had to say, you go with what His Honor said." Both defense attorneys accurately stated the burden of proof in their two hours of closing arguments, after which the prosecutor's rebuttal accurately stated the burden of proof. The trial judge accurately charged the jury with the correct burden of proof.

The challenged comment was isolated, likely unintentional, and without any prejudicial impact because the comment related to testimony discussing the alleged assault and unlawful restraint of Pinchuk, of which the defendant was ultimately acquitted. In the context in which it was made during closing arguments, we conclude that this comment was not improper.

### B

### Vouching for the Credibility of the State's Witnesses

The defendant claims that the prosecutor impermissibly vouched for the credibility of the state's witnesses on eight different occasions.[11] Specifically, the defendant points to the prosecutor's use of words such as "credible," "honest," and "truthful." The defendant asserts that, because the credibility of the witnesses was a central issue in the case, the impact of the prosecutor's alleged vouching "devastated the defense." The state responds that the prosecutor's statements were not improper and, instead, were permissible because "the state may argue that its witnesses testified credibly, if such an argument is based on reasonable inferences drawn from the evidence." *State* v. *Warholic*, 278 Conn. 354, 365, 897 A.2d 569 (2006). We agree with the state.

"The parameters of the term zealous advocacy are . . . well settled." (Internal quotation marks omitted.) Id., 363. "[A] prosecutor may not express his [or her] own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . However, [i]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to

persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he [or she] is simply saying I submit to you that this is what the evidence shows, or the like." (Citation omitted; internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 583–84, 849 A.2d 626 (2004).

A prosecutor's mere use of the words "honest," "credible," or "truthful" does not, per se, establish prosecutorial impropriety. In *State* v. *Luster*, supra, 279 Conn. 438 n.7, this court found no prosecutorial impropriety when the prosecutor pointed to a witness' testimony and stated that " '[the witness] was, I think, if you will look at his testimony, honest and open with us.' " This court reasoned that the prosecutor had not made bald assertions that the state's witnesses had been honest such that his remarks might constitute the "unsworn and unchecked testimony" suggestive of a prosecutor's "special position" and his "access to matters not in evidence," which a jury may infer to have "precipitated the [prosecutor's] personal opinions" of the witness' veracity. (Internal quotation marks omitted.) Id., 435. Instead, the prosecutor in that case had referred to the facts adduced at trial, the witness' demeanor on the witness stand, and testimony indicating that its witness, unlike the other witnesses, had no personal connection to either the victim or the defendant. Id., 439.

With these principles in mind, we now turn to the defendant's specific claims of vouching in the present case. We agree with the Appellate Court that the four claimed instances of vouching in the prosecutor's closing argument do not purport to convey the prosecutor's *personal opinion* of the credibility of the witnesses; instead, the prosecutor's statements, when placed in the context in which they were made, are reasonable inferences the jury could have drawn from the evidence adduced at trial.[12] See *State* v. *Ciullo*, supra, 140 Conn. App. 415. The prosecutor pointed to facts likely to give rise to the reasonable inference that the laborer's testimony was credible, such as the laborers' lack of motive to lie, lack of ability to speak English, and holes in the testimony that if the laborers had been lying they would have plugged. The prosecutor did not make a bald assertion of witness credibility or state his personal opinion as to the veracity of the witnesses; instead, he "posited a reasonable inference that the jury itself could have drawn without access to the [prosecutor's] personal knowledge of the case." *State* v. *Stevenson*, supra, 269 Conn. 584. He did not "suggest the existence of secret knowledge" but instead based his opinion on "the ascertainable motives of the witnesses." Id., 584–85. He meticulously laid out the facts from which to draw the reasonable inferences that the witnesses were credible.

We also conclude that the claimed instances of vouching in the prosecutor's rebuttal do not purport to convey his *personal opinion* of the credibility of the witnesses; instead, the prosecutor's statements, when placed in the context in which they were made, are reasonable inferences the jury could have drawn from the evidence adduced at trial.[13] Moreover, after defense counsel objected to the prosecutor's statements, the prosecutor stepped back and reminded the jury that, "I don't have any—let me make something clear, I am just arguing common sense here, I don't have any special knowledge or any knowledge that you don't have." The prosecutor explicitly disclaimed any personal opinion of the witnesses' credibility based on "access to matters not in evidence," obviating any claim that the prosecutor was relying on his "special position" and using the "imprimatur of the [state] . . . [to] induce the jury to trust the [state's] judgment rather than its own view of the evidence." (Internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 38, 975 A.2d 660 (2009). We conclude that the prosecutor did not improperly vouch for the credibility of the state's witnesses, though he would be well advised to avoid statements of this kind in the future.

The defendant also asks us to overrule the "dangerous exception to the ban on vouching," claiming that prosecutors should not be able to vouch for the credibility of their witnesses and insulate their statements from claims of impropriety under *Williams* by tacking on references to corroborative facts in the record. Instead, the defendant proposes that prosecutors never be permitted to urge that their witnesses told the truth, especially in cases in which the vouching is aimed at "sharply contested facts" flowing from the witnesses whose credibility is at issue. In response, the state urges us to follow this court's existing jurisprudence allowing a prosecutor to comment on witness veracity only if the statements are reasonably inferred from the evidence and/or common sense. We decline the defendant's invitation to overrule this court's jurisprudence.

"It is well established that a prosecutor may argue about the credibility of witnesses, as long as her assertions are based on evidence presented at trial and reasonable inferences that jurors might draw therefrom. . . . Moreover, [i]n deciding cases . . . [j]urors are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to [the jurors'] common sense in closing remarks." (Citation omitted; internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 617–18, 65 A.3d 503 (2013). Our jurisprudence permits these statements from the prosecution, if properly presented, because "[w]e must

give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 36, 917 A.2d 978 (2007).

We decline to adopt the defendant's suggestion of a bright line rule prohibiting a prosecutor's statements on credibility in "pure credibility" cases, because these statements may be reasonably inferred from evidence adduced at trial, because juries are credited with being able to differentiate between proper and improper arguments, and because of the subjectivity involved in characterizing a case as a "pure credibility" case versus a case with "sharply contested facts."[14] Cf. *State* v. *Singh*, 259 Conn. 693, 710–11, 793 A.2d 226 (2002) (declining to adopt bright line rule that would allow prosecutors to ask questions and argue in closing about whether witness' testimony "is the opposite of or contradicts the testimony of other witnesses, thereby presenting a basic issue of credibility" in contrast to prohibition of prosecutors from asking questions and arguing in closing about whether witness "lied" because "[i]t would be unwise, in our view, to make the application of this exception predicated on such a difficult distinction, which is relegated properly to the jury" [internal quotation marks omitted]). Though we caution against all forms of vouching; see *State* v. *Alexander*, 254 Conn. 290, 305, 755 A.2d 868 (2000) (noting that vouching "is especially significant in . . . case[s] where the credibility of the victim and the defendant comprised the principal issue of the case"); we affirm this court's jurisprudence allowing a prosecutor to "invit[e] the jurors to draw reasonable inferences from the evidence presented to them" so long as the prosecutor's "assertions are based on evidence presented at trial and reasonable inferences that jurors might draw therefrom." *State* v. *Medrano*, supra, 308 Conn. 617.

C

Denigrating the Defense and Impugning the Credibility of the Defendant's Testimony

The defendant claims that the prosecutor improperly denigrated the defense, impugned the defendant's testimony as "incredible," and implied that the only way the jurors could find the defendant not guilty was if they found that the prosecution's witnesses had lied. We address each of these arguments in turn and conclude that, although some, but not all, of the comments were questionable, even if we were to assume, without deciding, that the prosecutor's remarks were improper, the comments do not compel a reversal of the judgment.

The defendant first claims that the prosecutor improperly disparaged the defense by implying that

defense counsel unnecessarily prolonged the cross-examination of the laborers, calling the cross-examination "lengthy and laborious."[15] The state replies that the reference to the length of the cross-examination was only meant to highlight that the laborers' testimony had remained consistent throughout a difficult cross-examination. We agree with the state.

We disagree with the disparaging import the defendant attributes to this statement and, even assuming the statement could have disparaged the defense, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 368. This brief statement comprised a few words among hours of closing arguments after a thirteen day trial. The language itself was neither colorful nor malicious and, in context, we do not agree that the statement denigrated the defense. The isolated comment was not improper.

The defendant next claims that the prosecutor improperly impugned the defendant's testimony and implied that the only way the jurors could find the defendant not guilty was if they found the prosecution's witnesses lied.[16] The state responds, first, that none of the comments were improper in context because the prosecutor pointed to facts in evidence and asked the jury to apply common sense to the evidence in order to delineate the motives of a police officer and the laborers to testify truthfully. Next, the state asserts that the statements in the closing argument were not improper because they were meant to "preempt" defense counsel's likely argument that the state's witnesses had coordinated their testimony to falsely accuse the defendant. Finally, the state asserts that, even if these statements violated *State* v. *Singh*, supra, 259 Conn. 693, this court should overrule *Singh* to the extent that, in a "pure credibility" case, *State* v. *Fauci*, supra, 282 Conn. 48, permits the prosecutor to infer that one of the two sides is lying.

"[C]ourts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied.[17] . . . The reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof." (Citations omitted; footnote altered; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 709. Statements of this type "create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied. . . . This risk is especially acute when the witness is a government agent in a criminal case. *United States* v. *Fernandez*, 145 F.3d 59, 64 (1st Cir. 1998) (finding it unfair to force witness to choose between

recanting own testimony and calling law enforcement officer a liar [g]iven the faith the jury may place in the word of a law enforcement officer); *United States* v. *Weiss*, 930 F.2d 185, 195 (2d Cir.), cert. denied, 502 U.S. 842, 112 S. Ct. 133, 116 L. Ed. 2d 100 (1991) (explaining that special concern may be warranted in such cases because some people may believe that government agent has heightened credibility) . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 708; accord *State* v. *Bell*, 283 Conn. 748, 779 n.24, 931 A.2d 198 (2007) (reiterating risk of distorting burden of proof, especially when witnesses jury must find to be lying are police officers).

In *Singh*, this court warned that "closing arguments providing, in essence, that in order to find the defendant not guilty, the jury must find that witnesses had lied, are . . . improper." *State* v. *Singh*, supra, 259 Conn. 712. In the present case, the state concedes that the prosecutor's statements in his closing argument "directly [link] the defendant's innocence to believing that the state's witnesses were lying and, taken in isolation, [are] generally barred under *Singh*." Nevertheless, the state asserts that it was entitled to make the statements in its closing arguments because the statements would anticipatorily "preempt" defense counsel's argument that the state's witnesses conspired against the defendant. The state also asserts that the prosecutor's statements "[furnished] the jurors with a permissible way to side with the state's witnesses and disbelieve the defendant in their pure credibility contest . . . ." Although the prosecutor's use of the word "lying" appears to fall within the language prohibited by *Singh*, and should be discouraged, for the purposes of our analysis we assume, without deciding, that the comments violated *Singh*. See *State* v. *Singh*, supra, 709–12.[18]

Next, the state asserts that we should overrule *Singh*'s prohibitions in "pure credibility" cases, such as the present case, because the risks of misleading the jury and distorting the burden of proof are not implicated when the jury's sole task is to determine which witnesses are credible because the only way to find that the defendant had brandished his gun would be to decide that some witnesses had lied.

In support of its argument, the state cites *Fauci*, in which this court stated that "in a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and thus to argue, that one of the two sides is lying. . . . For instance, as [this court] previously noted in [*State* v. *Stevenson*, supra, 269 Conn. 584–85], it was not improper for a prosecutor to suggest that the police and the victims had no reason to lie but that the defendant and his friends and family did have a reason to do so. . . . We reasoned that this was proper because it was based on the ascertainable

motives of the witnesses rather than the prosecutor's personal opinion. . . . We also noted that the prosecutor's remarks underscored an inference that the jury could have drawn entirely on its own, based on the evidence presented." (Citations omitted; internal quotation marks omitted.) *State* v. *Fauci*, supra, 282 Conn. 39–40. "The distinguishing characteristic of impropriety in [*Fauci*] is whether the prosecutor asks the jury to believe the testimony of the state's witnesses because the state thinks it is true, on the one hand, or whether the prosecutor asks the jury to believe it because logic reasonably thus dictates." Id., 48.

This court has recently found *Singh* violations in closing arguments where the "prosecutor made a direct connection between the defendant's acquittal and the credibility of every other witness in the case." *State* v. *Albino*, 312 Conn. 763, 788, A.3d (2014).[19] We stated that, "under *Singh*, it is not per se improper to argue that the jury must conclude that one side of conflicting accounts must be wrong. Although we conclude that it would be unwise in the present case to attempt to articulate a bright line rule as to when such argument would be improper, we urge prosecutors to avoid statements directly connecting these assessments to the defendant's conviction or acquittal." Id., 788 n.10.

We thus decline the state's invitation to overrule *Singh*. For the reasons discussed previously in this opinion, we also decline the state's suggestion to adopt a bright line rule as to an application of *Singh* that would require a court to differentiate between a "pure credibility" case and a case with "sharply contested facts." See footnote 14 of this opinion. Therefore, although we express our displeasure with some of the prosecutor's comments, we assume, without deciding, that his comments were improper and violated *Singh*. In view of the analysis set forth in part II of this opinion, however, the comments do not compel a reversal of the conviction.

D

Appealing to the Jurors' Emotions

The defendant lastly claims that the state improperly appealed to the jurors' emotions by referring to the laborers and Pinchuk as "victims" and making other inflammatory statements during the state's rebuttal. We address each argument in turn and conclude that, although some, but not all, of the comments were questionable, even if we were to assume, without deciding, that the remarks were improper, the result would remain unaltered.

The defendant first claims that the prosecutor improperly referred to the laborers as "victims" three times during his closing argument and once during rebuttal, and improperly referred to Pinchuk as a "victim" three times during direct examination of the police

officers. The state responds that the use of the term "victim" was not sufficiently "excessive" under *State* v. *Warholic*, supra, 278 Conn. 370 n.7, so as to divert the jurors from the evidence, given the amount of times the prosecutor referred to the laborers and Pinchuk by their names. We agree with the state.

In *State* v. *Cortes*, 276 Conn. 241, 885 A.2d 153 (2005), this court held that a trial court's repeated reference to the complainant as the "victim" during its jury charge was inappropriate in a case where the commission of the crime was at issue. By contrast, in *Warholic*, this court held that a *prosecutor's* reference to the complainant as the "victim" was not necessarily inappropriate because "the jury was likely to understand that the state's identification of the complainant as the victim reflected the state's contention that, based on the state's evidence, the complainant was the victim of the alleged crimes." *State* v. *Warholic*, supra, 278 Conn. 370. This court "caution[ed] the state, however, against making excessive use of the term 'victim' to describe a complainant when the commission of a crime is at issue because prevalent use of the term may cause the jury to draw an improper inference that the defendant committed a crime against the complainant." Id., 370 n.7. In *Warholic*, the state made only two references to the complainant as the victim, compared with thirty-four references to the complainant by name in the rest of its closing arguments. Id.

In the present case, the prosecutor made only four references to the laborers as "victims" in its closing argument and rebuttal, and three references to Pinchuk as a "victim" during examination of the police officers. We conclude that, as in *Warholic*, this was not sufficiently excessive to be improper,[20] though we reiterate our caution to the state to refrain from making excessive use of the term "victim" to describe a complainant when the commission of a crime is at issue.

The defendant next claims that the prosecutor improperly appealed to the jurors' emotions in his rebuttal, thus soliciting sympathy for the laborers.[21] The state responds that these statements merely provided the jurors with "a necessary and vivid perspective" of the "depth of the laborers' motivation to testify truthfully," which spoke to the laborers' credibility. We determine, that even if we were to assume, without deciding, that the prosecutor's remarks were improper, the result would remain unaltered.

"[A] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Medrano*, supra, 308 Conn. 615. "When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal

of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Alexander*, supra, 254 Conn. 307. "[A] prosecutor should not inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 376.

In the present case, the prosecutor's statements that the laborers "would have walked over the Peruvian Andes Mountains to get here," that "they would have walked a thousand miles to testify in this case," and that the laborers "would have walked [fifty] miles to come in here and testify against the two men that humiliated them, made them beg, put guns to them, pointing guns at them, and treated them as if they were dirt that got dug up out of that driveway that day" were questionable. The prosecutor's personal opinion about how far the laborers would have walked to testify in this case is wholly irrelevant and has "no bearing on witness credibility or any factual issue in the case" other than "to encourage the jury to sympathize with [the laborers] and to decide the case on the basis of passion and emotion." *State* v. *Warholic*, supra, 278 Conn. 377. We therefore, assume, without deciding, that these remarks were improper.

We conclude that the prosecutor's description of the defendant in the statement accusing the defendant of "treat[ing] [the laborers] as if they were dirt that got dug up out of that driveway that day" was fleeting and, therefore, not so repetitious as to become improper. We assume, without deciding, that the prosecutor's statements that the laborers had been so humiliated that they would have walked far lengths to testify truthfully at trial was an injection of extraneous matters, an appeal to the emotions of the jurors, and an attempt to encourage the jury to identify with the victims, but that any alleged impropriety does not alter the judgment in this case.

## II

We now turn to the question of whether the prosecutor's alleged improprieties deprived the defendant of his due process right to a fair trial. "[O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, supra, 204 Conn. 540, with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the impropriety to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"We recently clarified that when a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Citation omitted; internal quotation marks omitted.) *State* v. *Medrano*, supra, 308 Conn. 619–20.

After considering the prosecutor's various alleged improprieties—impugning the credibility of the defendant, urging that to acquit the defendant the jury had to find that the state's witnesses had lied, and appealing to the emotions of the jurors—in the context of the entire trial, we hold that the defendant has not shown a denial of due process.

We begin by determining whether the alleged improprieties were invited by the defense during the trial. The defendant notes that many of the allegedly improper statements occurred in the state's closing arguments, before defense counsel had had a chance to invite the improprieties because defense counsel had not yet made his own closing argument. The defendant also notes that defense counsel's closing argument did not invite any improprieties in the state's rebuttal. The state does not point to any statements in the record that would have invited the alleged prosecutorial improprieties.[22] We note that much of the prosecutor's statements in this case were unprovoked and, in fact, worsened after defense counsel's objections. Accordingly, we conclude that the alleged improprieties were not invited.

We next consider whether the alleged improprieties were severe. In determining whether prosecutorial impropriety is severe, we consider whether defense counsel objected to the improper remarks, requested curative instructions, or moved for a mistrial. See *State* v. *Fauci*, supra, 282 Conn. 51. We also consider whether the "impropriety was blatantly egregious or inexcusable." Id. The defendant objected to some of the alleged improprieties in the present case, after which the prosecutor continued to make similar statements, culminating in the trial judge's directive to "leave it out." The statements of the prosecutor relating to the laborers' socioeconomic status and national origin and to the lengths the laborers would have walked to testify to receive justice for their humiliation were inexcusable in any context; nevertheless, defense counsel did not move to strike those comments and did not request targeted curative instructions from the trial judge during closing arguments. Instead, defense counsel "ask[ed] the court just to give that instruction [in the jury charge] that I think you are going to give them anyway, that the arguments of counsel are not evidence in that regard."[23] Despite the possible severity of such comments, the statements made by the prosecutor in

the present case were infrequent and confined almost exclusively to two small passages among hours of closing arguments after thirteen days of trial.

We next consider whether the alleged improprieties were central to the critical issues in the case. Although we agree that the case mostly centered on a determination of credibility, not all of the allegedly improper statements implicated this issue. Viewed in the context of the rest of the trial, however, the impact of these alleged improprieties was minimal.[24] Even if all of the statements had affected a determination of credibility, the defendant was acquitted of the some of the charges against him, clearly demonstrating the jurors' ability to filter out the allegedly improper statements and make independent assessments of credibility.

The jurors' acquittal of the defendant on some charges also speaks to the strength and efficacy of the curative measures adopted.[25] The defendant, citing *State* v. *Ceballos*, 266 Conn. 364, 413, 832 A.2d 14 (2003), asserts that the curative instructions to the jury were insufficient because they were neither contemporaneous nor specifically directed at the alleged prosecutorial impropriety involved. We disagree that the curative instructions in this case were insufficient and further note that, as in *Ceballos*, defense counsel "did not object to the content of this curative instruction. . . . [W]e note that the defendant, by failing to bring [the improprieties] to the attention of the trial court, bears much of the responsibility for the fact that these claimed improprieties [may have gone] uncured." (Citation omitted.) Id., 413–14.

Lastly, the state's case against the defendant for unlawful restraint of the laborers was strong. The defendant admitted facts[26] that a jury, even discrediting the laborers and believing the defendant, could reasonably have concluded constituted unlawful restraint. In the context of the trial—in light of the defendant's admissions, the testimony of the laborers and police officers, the 911 call, and the physical evidence that the gun was fully loaded with the safety off—the state's case was strong, independent of any alleged prosecutorial improprieties.

Considering the alleged prosecutorial improprieties within the context of the entire trial, we hold that the defendant was not denied a fair trial under the *Williams* standard and, therefore, agree with the Appellate Court that reversal of the defendant's conviction of two counts of unlawful restraint in the first degree is unwarranted.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] General Statutes § 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury."

As explained subsequently in this opinion, the Appellate Court also

reversed the defendant's conviction on a third count of unlawful restraint in the third degree. This count is not, however, at issue in the present appeal.

[2] Like the Appellate Court, we refer to Illescas and Diaz collectively as the laborers and individually by name.

[3] Angelo Ciullo was tried with the defendant and convicted of two counts of unlawful restraint and one count of possession of a weapon in a motor vehicle. Angelo Ciullo did not appeal from these convictions. See *State* v. *Ciullo*, supra, 140 Conn. App. 398 n.1.

[4] We note that this case involves a credibility dispute between the testimony of the two laborers and the defendant as to the extent of the defendant's display of his gun. See footnote 26 of this opinion.

[5] The defendant also claimed that: (1) "the trial court improperly instructed the jury on the elements of unlawful restraint, self-defense and the defense of property, and marshaled the evidence in favor of the state"; (2) "there was insufficient evidence to prove that he had committed the crime of unlawful restraint in the first degree"; (3) "the court abused its discretion with respect to alleged juror misconduct"; and (4) "the court improperly precluded him from entering a surveillance videotape into evidence and from eliciting certain testimony of a witness." *State* v. *Ciullo*, supra, 140 Conn. App. 395–96.

[6] We granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly determine that the defendant was not denied his right to a fair trial based upon several instances of claimed prosecutorial impropriety?" *State* v. *Ciullo*, 308 Conn. 919, 62 A.3d 1133 (2013).

[7] See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) (setting forth four-pronged test to prevail on unpreserved constitutional claim).

[8] The *Williams* factors are: "[1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 540.

[9] The state also asserts that the defendant waived his claims of prosecutorial impropriety. We disagree. We note that defense counsel objected to many of the statements at issue, both during closing arguments and prior to the jury charge. The extent to which defense counsel acceded to the use of the jury charge to attempt to ameliorate the effect of the prosecutor's comments will be weighed in our discussion of the relevant *Williams* factors, such as the severity of the impropriety and the strength of the curative measures adopted. See *State* v. *Luster*, supra, 279 Conn. 426–28; *State* v. *Williams*, supra, 204 Conn. 540.

[10] The prosecutor's comment, in his discussion of the alleged assault of Pinchuk, was as follows: "[A] jury is allowed to draw all rational and reasonable inferences from the evidence. [Pinchuk's] blood is on that shovel. And the only place we can see that she bled would be up there on the patio steps. That's where the blood had to come from. And that shovel had to be carried from those back steps down to 176 [Byram Shore Road]. And along the way the defendant could easily have shoved that shovel into the dirt numerous times as he ran back to the scene. As a matter of fact, if he was holding it in one hand, you could almost just picture him with that shovel hitting the ground, going into the dirt, its edges being cleaned of any human tissue or any human trace that might have been on the shovel edge. So beyond a reasonable doubt all roads lead back to the way [Pinchuk] described that event and that guilt of that man right there.

"*The . . . testimony* [*of the defendant and Angelo Ciullo*] *does nothing at all to create a doubt in this case.* They leave you a tale that performs incredible twists and turns as it attempts to weave its way between uncontested facts. How come [Pinchuk's] blood is on the shovel? [Angelo Ciullo] says, just coincidentally she happened to fall there." (Emphasis added.)

[11] The defendant cites four instances of vouching in the prosecutor's closing argument: (1) "[Diaz] said things that had to be true"; (2) "[the laborers] testified to facts that give their testimony a little ring of truth"; (3) "[the laborers'] honest sense that they have been humiliated is what motivated them to come in here and testify as honestly and as accurately as they could"; and (4) "[a]s a matter of fact, if you believe them, and they are credible, the [laborers], they dropped the tools just trying to get out of the way of the truck."

The defendant cites four instances of vouching in the prosecutor's rebuttal: (1) "they testified true and straight and withstood the test of a lengthy

and laborious cross-examination"; (2) "those men are credible"; (3) "[the laborers testified] truthfully and accurately"; and (4) describing the laborers as "honest."

[12] The first four statements, in context, are as follows: "But how do we explain the testimony of . . . Diaz? He plainly saw the [defendant] pick up that shovel and run after [Pinchuk] with the shovel in one hand and the gun in the other. And . . . Diaz has no motive to lie. He has no lawyer, no law suit. He doesn't speak English so he couldn't conspire with . . . Pinchuk . . . . And clearly he did not conspire with [Illescas] to say what he said about [the defendant] picking up the shovel or running after [Pinchuk] with the gun because [Illescas] says he was facing the other way. And while he could hear the [defendant] chasing off, he didn't see it. So he never testified that he saw the chase. Common sense tells us that there is not a conspiracy between [the laborers] to give false testimony. If people wanted to conspire to give false testimony, they would have made up a little bit better of a story than that.

"As a matter of fact, both [Illescas] and [Diaz] *testified to facts that give their testimony a little ring of the truth*. You have . . . Diaz testifying that he was so scared he ran behind . . . Pinchuk. And that's not an easy thing for a man to admit. Just because he doesn't speak English and he is an illegal alien, and he has to work hard physical labor that no one else seems to want to do these days, does not mean that he doesn't have the same sense of pride as the rest of us. And no one wants to admit that when the fur flies, you run behind an old woman. That's just not human nature. That's the type of thing you only admit if it was true. And he came in here and *he said things that had to be true*. You just don't make that up. And that, by the way, is what common sense tells us what motivated him to come here in the first place. These two men right there humiliated [the laborers], whether they are self-aware enough to know that or not. *And that honest sense of outrage by* [*the laborers*], *that honest sense that they have been humiliated is what motivated them to come in here and testify as honestly and as accurately as they could.*" (Emphasis added.)

Later, when discussing the defendant's claim of self-defense, the prosecutor stated: "[The defendant] did not restrain the [laborers] because they represented a threat. It is not as if the [laborers] picked up tools when the truck pulled up. As a matter of fact, *if you believe them, and they are credible, the* [*laborers*], they dropped the tools just trying to get out of the way of the truck. And they begged and they tried to run and they never made an aggressive move the entire time. Even the defendants admit no aggressive move was ever made against them." (Emphasis added.)

[13] We place the last four statements in context, though we discuss some portions of the statements subsequently in this opinion as allegedly improper appeals to the jurors' emotions. In the first statement, the prosecutor pointed to testimony demonstrating that the laborers' testimony was consistent with its other witnesses: "And clearly [the laborers] were cross-examined forever. I mean, you sat there. You saw what they went through. They got questioned on everything and they *testified true and straight and withstood the test of a lengthy and laborious cross-examination*. . . . And on that cross-examination they did not budge. And, of course, they corroborate . . . Pinchuk. . . . [T]here was no call to the police and there [are] no sirens in the background there either. . . .

"At any rate, I guess this conspiracy has to start the moment that . . . Pinchuk begins screaming and saying she is seeing a silver gun. The fact of the matter is . . . that that is ridiculous and there is no conspiracy here between the Spanish speaking individuals, [Pinchuk], who is from Poland with the heavy Polish accent, it is difficult to understand [her] even if you are a native English speaker. And the police are not in on this conspiracy either to frame them with regard to moving around items in the car or not listening to this false story about the pulling of the guns and taking the safety off while it is still pointed at your own leg." (Emphasis added.)

The prosecutor then addressed the facts and specific testimony in support of unlawful restraint and addresses defense counsel's arguments for self-defense, defense of premises, and civilian arrest. In his discussion of whether the shovel was the instrumentality that caused Pinchuk's hand wound, the prosecutor discusses the expert testimony and then the testimony of the other witnesses: "And when you hear [the experts] in conjunction with the way . . . Pinchuk described the event, and the fact that . . . Diaz gives us really the most important piece of information in the whole case because you wonder how could somebody do this, you don't want to believe it, but [Diaz] saw the [defendant] pick up the shovel, shovel in one hand, gun in the other, and go after [Pinchuk] down the street. Now, if you can do that, you can do the rest because you are just that mad. And that answers this

question, how could this have happened? How could he have done it? Well . . . Diaz answered that for us. *And those men are credible*. I think they are both from Peru. I have a feeling like they would have walked over the Peruvian Andes Mountains to get here." (Emphasis added.)

After this statement, defense counsel objected to the alleged vouching. The prosecutor quickly clarified for the jury: "Well, what I will say is that common sense suggests, I didn't mean to put it that way, common sense and the evidence suggest that they would have walked a thousand miles to testify in this case. And by the way, I don't have any—let me make something clear, I am just arguing common sense here, I don't have any special knowledge or any knowledge that you don't have."

The last two statements also occur while the prosecutor discussed how a commonsense inference from the stated testimony would lead the jury to reasonably infer that the laborers had been truthful: "You could do this argument and you will do the argument that I just did when you are back there debating it among yourselves. You don't need law degrees or anything like that to make these kinds of arguments. This is all common sense. And you have as much wits about you as I do. So when you go back there, be confident in your own common sense and be confident in the wits that God gives you to figure things out. You know, to draw upon your common experience as adult[s], as thinking adults. And you will get there and you will probably say something similar, which is that [the laborers] would have walked [fifty] miles to come in here and testify against the two men that humiliated them, made them beg, put guns to them, pointing guns at them, and treated them as if they were dirt that got dug up out of that driveway that day. That's why they were here, *honest*, outraged. That's why *they testified truthfully and accurately* . . . ." (Emphasis added.)

[14] A determination of a "pure credibility case" is an inquiry that may be answered differently depending on the point of view of the inquiring party. The parties in this case dispute whether this is a "pure credibility case" in some contexts but not others. For example, the defendant claims that this case involves "sharply contested facts" during its vouching argument, and highlights a " 'great conflict' " in the evidence in its *Williams* analysis, and yet boils the case down to a "central issue of credibility." The state characterizes this as a "pure credibility contest" initially, but points to conflicting expert testimony as to whether the shovel caused Pinchuk's hand injury. This collateral inquiry unnecessarily complicates the decision on whether a prosecutor may properly comment on the credibility of the witnesses.

[15] The prosecutor's statement, in the context of his rebuttal, is as follows: "And clearly [the laborers], they were *cross-examined forever*. I mean, you sat there. You saw *what they went through*. They got questioned on everything and they testified true and straight and withstood the test of a *lengthy and laborious cross-examination*. . . . And on that cross-examination they did not budge." (Emphasis added.)

[16] These claims will be considered together because the statements substantially overlap. The prosecutor's comments during closing argument, in context, are as follows: "[A]re we to believe that [Pinchuk] conspired with two Spanish only speaking workers to lie about the whole thing? Common sense compels us to the conclusion that the answer to that is no. And common sense tells us that *someone here is not telling the truth about what happened out there that day*. You have heard the testimony of [Pinchuk] and you have heard the testimony of the [laborers]. And then *you have the testimony of* [*the defendant and Angelo Ciullo*], *and someone is not telling the truth*." (Emphasis added.)

The prosecutor continued: "[The defendant and Angelo Ciullo] leave you a tale that performs *incredible* twists and turns as it attempts to weave its way between uncontested facts. How come [Pinchuk's] blood is on the shovel? [Angelo Ciullo] says, just coincidentally she happened to fall there. I imagine that's what that argument will be about. How come [Pinchuk] can describe the silver gun on her call to the police? Well, the [defendant] says he carefully went through all of those things where he exposed the weapon. He never told that to the police. Well, what is his explanation for that? Or he tried to tell the police, but they just wouldn't listen to a man describing how he pulled out a gun. And not even when he told how he carefully lifted his weapon out so everyone could see it, and he intentionally levered off the safety on his gun, was anybody interested in listening to him?

"Now, if you use your common sense and our common experience as adults, does anybody believe that . . . a police detective, wouldn't be interested in exploring a man's tale like the one you heard on the stand, *incredible on its face* . . . *incredible on its face* because who would lever the safety off while the gun was still pointing at their leg? No one would do that. . . .

"You heard [the] testimony [of the defendant and Angelo Ciullo], and it

was *incredible from start to finish*, from the moment they said they thought the police were on their way, from the moment they said the bats and police club were not visible in the cab of that truck, which means, of course, that even the police are in on this *conspiracy of lies* against them, in on this *conspiracy to frame* [*them*] for these crimes. . . . [A]ll those policemen are in this because they wouldn't listen to this tale that was *concocted* here about lifting the guns. And those other police officers are in on it because they moved the bats and they moved that police nightstick so that it would be visible and that these men would be framed. And, of course, [the laborers] who don't speak English conspired in this *web of lies*, which the police accepted, with the English speaking . . . Pinchuk. *Everyone is just lying here. Everyone is just lying except for* [*the defendant and Angelo Ciullo*]. *That is not an argument consistent with their innocence.* The exact opposite is true." (Emphasis added.)

The prosecutor's comments during the rebuttal, in context, are as follows: "And the fact of the matter is, despite what [defense] counsel says, that . . . Angelo Ciullo knew [the billy club] was there. He said so. He just forgot it was there. According to his testimony, if you want to credit it. So even according to [Angelo Ciullo's], I submit to you, *false testimony*, he knows [the billy club] is in the car, he just forgot he put it there. . . .

"So [Angelo Ciullo] never saw the billy [club] back there? I mean, who are we kidding, right? You have to keep your story straight when you are on that witness stand. He couldn't because *it wasn't true*. . . .

"On this conspiracy issue, that conspiracy had to start when [Pinchuk] was screaming. By the way, you don't hear sirens on that 911 tape in the background, do you? I guess maybe the police really weren't on the way there like they said. . . .

"At any rate, I guess this conspiracy has to start the moment that . . . Pinchuk begins screaming and saying she is seeing a silver gun. The fact of the matter is . . . that that is ridiculous and there is no conspiracy here between the Spanish speaking individuals, [Pinchuk], who is from Poland with the heavy Polish accent, it is difficult to understand [her] even if you are a native English speaker. *And the police are not in on this conspiracy either to frame them with regard to moving around items in the car or not listening to this false story* about the pulling of the guns and taking the safety off while it is still pointed at your own leg. That's ridiculous." (Emphasis added.)

[17] "Although this principle is cited most often when the testimony of police officers or government agents has been implicated, the rule is not limited to such witnesses." *State* v. *Singh*, supra, 259 Conn. 709 n.13.

[18] In *Singh*, this court did not "make the distinction between using the word 'wrong' as opposed to 'lying.' . . . Although questioning whether a witness' testimony is wrong may, at first blush, seem less egregious, we conclude that it is nonetheless improper because it requires the witness to characterize testimony and may lead to the same problematic results." (Citations omitted.) *State* v. *Singh*, supra, 259 Conn. 712 n.16.

[19] The prosecutor in *Albino* stated in his closing argument: "Ladies and gentlemen, in order for you to find the defendant not guilty of the crime of murder, you have to find that *everybody is wrong* in this case. The police are *wrong*. The detectives who interviewed him are *wrong*. The defendant's own friends and associates are *wrong*. . . . [The interpreter] is *wrong* . . . . Right? And almost incredible, you've got to find that the defendant's own statement is *wrong*, that he was *wrong*, because he didn't tell the cops that he acted in self-defense. You can't do that. You can't do that." (Emphasis in original; internal quotation marks omitted.) *State* v. *Albino*, supra, 312 Conn. 783. The prosecutor continued: "If you find that [the interpreter is] not credible, then you find the defendant's version credible, because they're in complete conflict, aren't they? They're in conflict. Ladies and gentlemen, in order for you to find the defendant not guilty you have to find that *every single person in this case is wrong*." (Emphasis in original; internal quotation marks omitted.) Id., 784.

[20] Moreover, the three references to Pinchuk as a victim were without prejudicial impact because the defendant was ultimately acquitted of the alleged assault and unlawful restraint of Pinchuk.

[21] The prosecutor's two statements, in context, are as follows: "[A]nd the fact that . . . Diaz gives us really the most important piece of information in the whole case because you wonder how could somebody do this, you don't want to believe it, but [Diaz] saw the [defendant] pick up the shovel, shovel in one hand, gun in the other, and go after [Pinchuk] down the street. Now, if you can do that, you can do the rest because you are just that mad.

And that answers this question, how could this have happened? How could he have done it? Well . . . Diaz answered that for us. And those men are credible. *I think they are both from Peru. I have a feeling like they would have walked over the Peruvian Andes Mountains to get here.*" (Emphasis added.)

After defense counsel's objection to this statement, the prosecutor continued: "Well, what I will say is that common sense suggests, I didn't mean to put it that way, common sense and the evidence suggest that *they would have walked a thousand miles to testify in this case.* And by the way, I don't have any—let me make something clear, I am just arguing common sense here, I don't have any special knowledge or any knowledge that you don't have." (Emphasis added.)

The prosecutor then discussed how a commonsense inference from the stated testimony would lead the jury to reasonably infer that the laborers had been truthful: "So when you go back there, be confident in your own common sense and be confident in the wits that God gives you to figure things out. You know, to draw upon your common experience as adult[s], as thinking adults. And you will get there and you will probably say something similar, *which is that these guys would have walked [fifty] miles to come in here and testify against the two men that humiliated them, made them beg, put guns to them, pointing guns at them, and treated them as if they were dirt that got dug up out of that driveway that day.* That's why they were here, honest, outraged. That's why they testified truthfully and accurately. . . ." (Emphasis added.)

[22] Though we do not conclude that the state impermissibly vouched for its witnesses, the state asserted that, to the extent it vouched for the credibility of its witnesses in its closing argument, its statements permissibly "preempt[ed]" defense counsel's anticipated invitations for prosecutorial impropriety. We find absolutely no merit in this argument.

[23] We also note that the defendant's appeal to the Appellate Court claimed only improper vouching by the prosecutor, which indicates tangentially that defense counsel may not have thought the other improprieties to have been severe.

[24] We note that some of the alleged improprieties implicate only Angelo Ciullo, such as the prosecutor's characterization of Angelo Ciullo's testimony about the billy club as "false." See footnote 16 of this opinion. Angelo Ciullo is not, however, a party to this appeal. See footnote 3 of this opinion.

[25] The trial judge charged: "Now you have to base your decision on evidence. Evidence in a trial consists of sworn testimony of witnesses elicited both on direct examination and cross-examination, redirect and re-cross, if there is any, plus any concessions or stipulations of fact made during the trial by counsel and any exhibits that were received and marked in evidence. It is only on the basis of such evidence that you are to make your final determination of . . . the facts.

"The testimony of witnesses, which was stricken from the record or exhibits which were merely marked for identification are to be totally disregarded by you. *In addition, all comments or remarks made by counsel or between the [c]ourt and counsel must be disregarded by you. In other words, you must decide the case based solely on the evidence.*" (Emphasis added.)

[26] The defendant testified that "I then turned around and put my hand on my gun, and I even bent like this so [Illescas] would see it. You know, listen, I have a gun, the police are going to come, you are going to be arrested. . . . I proceeded to put my hand on my gun and after that I undid the snap to my holster. . . . And then I just lifted it slightly to take the safety off. . . . I lifted it slightly to take the safety off because once you undo the snap, right underneath it is the safety. So it's one motion actually. . . . [A]nd then I pulled it slightly so I can get my hand around the trigger guard. . . . The trigger guard is around the trigger . . . . What I did next was continually show him that I had a gun and continually tell him that the cops are going to come, you are going to be arrested. . . . As the sirens got closer . . . Diaz went down and sat on the ground, and . . . Illescas was almost on the ground."